[No. 55886–8. En Banc. September 14, 1989.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
IN
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, *Plaintiff,*
v. GENERAL ELECTRIC COMPANY, ET AL,
*Defendants.*

*Stanley J. Bensussen* and *Anthony C. Eitreim; Malcolm L. Edwards* and *Edwards & Barbieri* (*Wolfgang Hoppe, Thomas J. Heiden, Allyn D. Kantor, Richard A. Gaffin,* and *Miller, Canfield, Paddock & Stone,* of counsel), for plaintiff.

*P. Cameron DeVore, Bruce Lamka, R. Bruce Easter, Jr.,* and *Davis Wright & Jones* (*Wm. Bruce Hoff, Jr., William A. Gordon, Douglas A. Poe, Michael F. Kerr, Gary A. Isaac,* and *Mayer, Brown & Platt,* of counsel), for defendants.

DOLLIVER, J.—Plaintiff, the Washington Public Power Supply System (Supply System), is a nonprofit municipal corporation under the laws of the State of Washington and a joint operating agency authorized by RCW 43.52. The Supply System was created in 1957. Its members are 19 public utility districts (PUD's), all located in the state of Washington, and the cities of Richland, Seattle, Ellensburg, and Tacoma.

Prior to 1970, the Supply System undertook to construct and operate Washington Nuclear Project No. 2 (WNP–2), a nuclear electric generating station located on the Hanford Nuclear Reservation. Although the members have a statutory preference right to purchase all the electric energy generated by the Supply System, in order to finance the construction, the members sold this right to 94 participants, who in turn sold their capability under net billing agreements to the Bonneville Power Administration (BPA). The participants are statutory preference customers of the BPA and are comprised of 27 municipalities, 22 districts, and 45 cooperatives, located in Washington, Oregon, Idaho, and Montana. The BPA constructs and operates transmission facilities and markets power from federal hydroelectric projects in the Pacific Northwest. The BPA is also authorized to acquire electric resources from nonfederal entities to fulfill its obligation to meet the firm power requirements of all requesting utilities in the Pacific Northwest.

The Supply System, to implement its decision to construct WNP–2, retained Burns & Roe, Inc. (B&R) as the architect–engineer which issued a request for proposals on the design, construction, and installation of the various components. Defendant General Electric Company's (GE) proposal regarding the Nuclear Steam Supply System (NSSS) was accepted, and on April 19, 1971, GE and the Supply System entered into the NSSS contract which is the subject of the underlying dispute in this case.

Under this contract, the Supply System was required to house GE's boiling water reactor in a concrete "pressure containment system" (PCS), which would "provide a leakage barrier to prevent significant fission product release caused by any design basis accident." To be effective, the PCS had to withstand hydrodynamic loads exerted upon the system by the movement of water within the system. In designing the PCS, B&R used load information, containment specifications, and reference drawings provided by GE. The PCS was reviewed and approved by GE, and construction was undertaken in accordance with this design.

In April 1975, when construction of the PCS was more than 80 percent complete, the Nuclear Regulatory Commission required the Supply System to provide information as to the potential magnitude of the hydrodynamic loads and the capability of the PCS to handle these loads. On February 24, 1976, the Supply System responded that the PCS required modification. The Supply System began the modification in March 1977.

In 1982, 7 years after the Supply System was aware of its potential claims, the Supply System informed GE that it might assert claims for the cost of modifying the PCS. At that time, the parties entered into an agreement tolling the statute of limitation. This action was filed in the United States District Court for Eastern Washington in January 1985. The Supply System seeks damages for fraud, breach of contract, and breach of implied warranty caused by GE's conduct in entering and performing the NSSS contract. Specifically, the Supply System alleges that GE knew or should have known the design of the PCS was inadequate and that GE fraudulently concealed this information and induced the Supply System to enter, perform, and agree to modify the PCS. GE denies these allegations and states that the modifications were necessary as a result of changes in regulatory standards.

GE moved for summary judgment on each of the above claims arguing, *inter alia,* that the claims were barred by the statutes of limitation. The Supply System countered that it was exempt from the defense of the statutes of limitation because it was bringing the action "for the benefit of the state" within the meaning of RCW 4.16.160. The District Court petitioned the following question for certification pursuant to RCW 2.60.020.

Is this an action "for the benefit of the state" under RCW 4.16.160, which excepts such actions from the provisions of Washington State's statutes of limitation?

We accepted certification and answer the certified question in the negative.

RCW 4.16.160 provides:

> The limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasi–municipality of the state, in the same manner as to actions brought by private parties: *Provided,* That . . . there shall be no limitation to actions brought in the name or for the benefit of the state . . .

█ In construing a statute, our paramount duty is to ascertain and give effect to the intent of the Legislature. *Addleman v. Board of Prison Terms & Paroles,* 107 Wn.2d 503, 509, 730 P.2d 1327 (1986). If a statute is subject to more than one reasonable interpretation, we must adopt the interpretation most consistent with the intent of the Legislature as derived from the language of the act as a whole and the previous constructions placed upon the statute by this court. *Stewart Carpet Serv., Inc. v. Contractors Bonding & Ins. Co.,* 105 Wn.2d 353, 358, 715 P.2d 115 (1986).

Initially and significantly, the parties and the District Court misconstrue the nature of the "for the benefit of the state" language in RCW 4.16.160. GE argues that a direct pecuniary benefit must inure to the State as a result of the action, while the Supply System contends, and the District Court agreed, that a much broader nexus is allowed between the action and the resulting benefit to the State. Neither the parties nor the District Court, however, fully appreciate the meaning of "for the benefit of the state", and each treats the language as the needed *effect* of the municipal conduct rather than a description of the *character or nature* of that conduct.

Because of this erroneous focus on the effect of the municipal conduct, the parties disagree as to whether the statute sets forth a conjunctive or a disjunctive test for municipal immunity. GE and the District Court interpret the statute to mean that municipalities are exempt from our State's statutes of limitation only if the action is brought for the benefit of the state *and* the action arose out of municipal conduct of a governmental nature. The Supply System argues the statute states two distinct grounds which

may independently exempt a municipality from the provisions of the statutes of limitation. Thus, according to the Supply System, a party is precluded from asserting a statute of limitation defense to an action brought by a municipality if the action is brought for the benefit of the State *or* the action arose out of governmental rather than proprietary municipal conduct.

The focus of the cases interpreting RCW 4.16.160 has not been upon the effect of the municipal conduct but upon the nature and character of the conduct. We have not used a conjunctive or a disjunctive test in determining municipal immunity. Rather, municipal actions are brought "for the benefit of the state" when those actions arise out of the exercise of powers traceable to the sovereign powers of the State which have been delegated to the municipality. *See Bellevue Sch. Dist. 405 v. Brazier Constr. Co.,* 103 Wn.2d 111, 114, 691 P.2d 178 (1984); *Tacoma v. Hyster Co.,* 93 Wn.2d 815, 613 P.2d 784 (1980); *Commercial Waterway Dist. 1 v. King Cy.,* 10 Wn.2d 474, 479, 117 P.2d 189 (1941); *Gustaveson v. Dwyer,* 83 Wash. 303, 145 P. 458 (1915). We have never sought to define "benefit of the state" in terms of a beneficial effect.

In the past, this court has looked solely to the nature and character of the power, the exercise of which resulted in the action to determine whether a statute of limitation defense was foreclosed by the statute. In *Hyster,* the court determined that collecting taxes was the exercise of a sovereign power, thus precluding the city from being subject to the statute of limitation. *Hyster Co.,* at 821. The court in *Gustaveson* was faced with the decision whether property purchased by the county at a tax foreclosure sale and held in trust for the political subdivisions entitled to apportionment of the tax on resale was held by the county in its governmental capacity. The court determined that the county's acquiring and holding the land was an exercise of "a right emanating in the power of taxation". *Gustaveson,* at 310. In doing so, the court stated "the vital question here has relation to the character of the power in the exercise of

which the county" acted and "[a]ll of the rights of the county here involved are traceable to and rest in the sovereign power of taxation." *Gustaveson,* at 310. Cited with approval were cases from other jurisdictions to the effect that the local governmental bodies, in the collection of taxes, were exercising the delegated powers of the state. *Gustaveson,* at 307–10. The *Gustaveson* court echoed this position.

> Looking to the power in the exercise of which the county's title to this land originated, we are constrained to hold that the county did not acquire or hold the land in a proprietary capacity, but in a governmental capacity. The land is not acquired by the county voluntarily but in the exercise of a mandatory duty prescribed by the state and in the exercise of the sovereign power of taxation. It acts, in effect, as the agent of the sovereign . . .

(Citations omitted.) *Gustaveson,* at 306. The court in *Commercial Waterway* reiterated this position. "[T]he tax collecting process . . . is 'an essential and basic attribute of sovereignty.'" *Commercial Waterway Dist. 1,* at 478 (quoting *Commercial Waterway Dist. 1 v. King Cy.,* 197 Wash. 441, 444, 85 P.2d 1067 (1938)). "No step in the tax collecting process is subject to the defense of the statute of limitations." *Commercial Waterway Dist. 1,* at 479.

This interpretation was articulated most recently in *Bellevue* wherein we allowed a school district to bring an action for breach of a construction contract against the builders of a high school completed 20 years earlier. Again, we focused on the nature and character of the power exercised by the school district in holding that the defense of the statute of limitation was precluded by RCW 4.16.160.

> The duty and power to educate the people are not only inherent qualities of sovereignty but are expressly made an attribute of sovereignty in the state of Washington by the state constitution. Const. art. 9, §§ 1, 2. The state exercises its sovereign powers and fulfills its duties of providing education largely by means of a public school system under the direction and administration of the State Superintendent of Public Instruction, State Board of Education, school districts and county school boards.

> School districts are, in law, municipal corporations with direct authority to establish, maintain and operate public schools and to erect and maintain buildings for that and allied purposes. In essence, a school district is a corporate arm of the state established as a means of carrying out the state's constitutional duties and exercising the sovereign's powers in providing education. The state has thus made the local school district its corporate agency for the administration of a constitutionally required system of free public education.

(Citations omitted.) *Bellevue,* at 115–16 (quoting *Edmonds Sch. Dist. 15 v. Mountlake Terrace,* 77 Wn.2d 609, 611–12, 465 P.2d 177 (1970)).

Consistent with the foregoing cases, we find that when a municipality brings an action which arises out of the exercise of powers traceable to the sovereign powers of the state which have been delegated to the municipality, the municipality is bringing the action "for the benefit of the state" within the meaning of RCW 4.16.160. Thus, the first section of RCW 4.16.160, "[t]he limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasi-municipality of the state, in the same manner as to actions brought by private parties", subjects municipalities to the defense of the statutes of limitation when they are acting in a proprietary capacity. The second provision, "*Provided, That . . .* there shall be no limitation to actions brought in the name or for the benefit of the state", exempts municipalities from the statutes of limitation when the municipality is acting as an agent of the state exercising delegated sovereign powers.

█ The language of the statute identifies the dual nature of municipal action and provides immunity when the municipality exercises delegated sovereign powers. The dualistic nature of municipal corporations is well understood.

> The purposes of municipal corporations, using the term in its strict meaning, are twofold: the one to assist in the government of the state as an agent of the state, often referred to as an arm of the state, and to promote the public welfare generally; the

other to regulate and to administer the local and internal affairs of the territory which is incorporated, for the special benefit and advantage of the urban community embraced within the corporation boundaries. These two functions are usually referred to as the dual powers of municipal corporations.

(Footnotes omitted.) 1 E. McQuillin, *Municipal Corporations* § 2.09, at 165 (3d ed. 1987).

When the "for the benefit of the state" language in RCW 4.16.160 is properly understood to refer to the character or nature of the municipal conduct, there is no need to determine whether a disjunctive or a conjunctive test is required under RCW 4.16.160, as asserted by the parties. The only inquiry is whether the municipal action arises from an exercise of powers traceable to delegated sovereign powers of the state or whether such action arises from an exercise of proprietary powers.

While the duality of municipal function is well understood, the classification of particular activities as governmental or proprietary has proved to be more difficult. *See generally* 1 E. McQuillin, § 2.09, at 166. Each case is determined in light of the particular facts involved. 1 E. McQuillin, § 2.09 at 166.

Our task, then, is to determine whether the conduct of the Supply System, in contracting with GE for the Nuclear Steam Supply System, was an exercise of delegated sovereign powers of the State, or whether it was an exercise of proprietary municipal power for the special or peculiar advantage of its own members. In doing so, we may look to constitutional or statutory provisions indicating the sovereign nature of the power, and we may consider our traditional notions of powers which are inherent in the sovereign. Relevant to this analysis are the general powers and duties under which the municipality acted, the purpose of those powers, and whether the activity or its purpose is normally associated with private or sovereign concerns. The distribution of benefits, however, is not relevant in determining the nature and character of the power exercised by the municipality.

In 1953, the Legislature created the Washington State Power Commission. Laws of 1953, ch. 281, § 2, p. 744. The Commission was authorized to "represent the state of Washington to the end that its water resources and other resources shall be properly developed for the best public interest in so far as they affect electric power . . . " Laws of 1953, ch. 281, § 20, p. 757. Operating agencies were authorized

> for the purpose of acquiring, constructing, operating and owning plants, systems and other facilities and extensions thereof for the generation and/or transmission of electric energy. Each such agency shall be a division of the state power commission with the right to sue and be sued in the name of the commission.

Laws of 1953, ch. 281, § 12, p. 753. In 1955, the Legislature amended the statute to change the nature of the operating agencies. Operating agencies were changed from being divisions of the State Power Commission to being "municipal corporation[s] and operating agenc[ies] of the state of Washington with the right to sue and be sued in [their] own name." Laws of 1955, ch. 258, § 3, p. 1051. In other respects, their purpose remained the same. In 1957, the Legislature abolished the Commission. Laws of 1957, ch. 295, § 8, p. 1180. In its stead, the Division of Power Resources of the Department of Conservation and Development was created. Laws of 1957, ch. 284, § 1, p. 1123. The purpose of the Division of Power Resources was to compile, collect, and disseminate information "to facilitate development of the electric power resources of the state by public utility districts, municipalities, electric cooperatives, joint operating agencies and public utility companies." Laws of 1957, ch. 284, § 2, p. 1123. The Director of Conservation and Development was authorized to represent the State and aid and assist the public utilities to develop the state's resources in the public interest. Laws of 1957, ch. 284, § 3, p. 1124. The Department of Conservation was abolished in 1967 and its powers, duties, and functions as to power resources were ultimately transferred to the Department of Ecology. *See* Laws of 1967, ch. 242, §§ 8, 20,

pp. 1335, 1343; Laws of 1970, 1st Ex. Sess., ch. 62, §§ 6, 26, pp. 575, 583. Therefore, the Supply System and the District Court are incorrect in stating the Supply System succeeded to the powers and duties of the Power Commission. The provision cited by the District Court as "preserv[ing] in the Supply System all of the Commission's powers and duties" does not support this conclusion. The 1957 law granted operating agencies

> the power and authority granted in this chapter to an operating agency . . . all power and authority heretofore granted, and . . . subject[ed the agencies] to all of the duties imposed upon, the Washington state power commission by RCW 43.52.300 and RCW 43.52.350.

Laws of 1957, ch. 295, § 5, p. 1178. Thus, the powers granted to the operating agencies were only those powers specifically granted to the agencies, not all the powers granted to the Commission. The duties imposed upon the agencies were only those in the two specific statutory provisions listed. RCW 43.52.300 lists the general duties of operating agencies including the duties to apply for permits and licenses, to establish rates for electric energy sold, to act as agent for the wholesale purchase and sale of electricity upon request of any city or district, and to construct and operate fishways and canals. RCW 43.52.350 imposes the duty of operating and maintaining fishways, facilities, and hatcheries as directed by the Directors of Game and Fisheries.

The current statute authorizing the formation of operating agencies provides:

> Any two or more cities or public utility districts or combinations thereof may form an operating agency . . . for the purpose of acquiring, constructing, operating and owning plants, systems and other facilities and extensions thereof, for the generation and/or transmission of electric energy and power. Each such agency shall be a municipal corporation of the state of Washington with the right to sue and be sued in its own name.

RCW 43.52.360. "Nothing in this chapter shall be construed to mean that an operating agency is in any manner an agency of the state." RCW 43.52.374(2).

The powers and duties given to operating agencies are those generally given to PUD's, and these powers must be used "[t]o generate, produce, transmit, deliver, exchange, purchase or sell electric energy and to enter into contracts for any or all such purposes." RCW 43.52.300(1); RCW 43.52.391. In accordance with this purpose, operating agencies may condemn land, enter into contracts, apply for licenses, establish rates for electric energy, construct and operate fishways, channels, locks, and canals, study the development, utilization, and integration of electric generating facilities, and issue revenue bonds to effectuate their purposes payable from the revenues of the utilities they operate. RCW 43.52.300(1)–(12); RCW 43.52.3411. However, the operating agencies are not given the power to levy taxes, issue general obligation bonds, or create subdistricts. Laws of 1957, ch. 295, § 5, p. 1178; RCW 43.52.391. The representatives of the various cities and PUD's retain effective control over the activities of the operating agency, although the Governor has limited appointment and removal power on an 11–member executive board. *See* RCW 43.52.370, .373, .374.

The State authorized the creation of operating agencies for the specific purpose of generating electric energy for the primary use of the members of the operating agency. *See* RCW 43.52.380. Subject to the statutory constraints as to purpose and structure, the power to create and control the operating agency is in the hands of the representatives of the persons comprising the cities and PUD's.

The State does have a primary interest in the operating agencies although not in the production of electric energy. These interests include the efficient use of the state's electrical resources, *see* RCW 43.52.360, and the preservation of the state's fishways and hatcheries, *see* RCW 43.52.300(8). However, the operating agencies are not charged with the responsibility of overseeing the State's policy on either the efficient use of state resources or the preservation of the state's fisheries. The State Energy Office is charged with the responsibility for carrying out the State's policy "to

foster wise and efficient energy use and to promote energy self–sufficiency . . ." RCW 43.21F.010, RCW 43.21F.035. The Department of Wildlife and the Department of Fisheries are charged with the duty to "establish, conduct, and maintain fish restoration and management projects . . . " RCW 77.12.440.

In addition, contrary to the assertion of the Supply System, the Legislature has not made operating agencies responsible for the nuclear safety of the people of Washington state. Although the safety aspects of nuclear generated electricity are overwhelming, the operating agencies are not charged with the public safety of the citizens of this state. *See Alverado v. WPPSS*, 111 Wn.2d 424, 432–33, 759 P.2d 427 (1988), (federal government occupies entire field of nuclear safety, except for limited powers ceded to states), *cert. denied*, 109 S. Ct. 1637 (1989).

██ While the State regulates the Supply System to some extent to effectuate its own purposes, the purpose of the Supply System is to generate electricity. There is no indication in the Washington Constitution or in the statutes that the development, production, or sale of electric energy to the citizens of Washington is a sovereign duty of the State. There is one statutory provision which authorizes cities of the first class, PUD's, and joint operating agencies to participate together in the development of nuclear and other thermal power facilities to achieve "economies of scale and thereby promot[e] the economic development of the state and its natural resources to meet the future power needs of the state and all its inhabitants." RCW 54.44.010. The Legislature declared this to be "in the public interest and for a public purpose". RCW 54.44.010. However, enabling this type of participation to achieve economies of scale, while in the public interest, does not transform the production of electric energy into a sovereign duty. In addition, the Supply System was not operating under such authority when it contracted, as a sole operating agency, with GE.

Thus, although the State may facilitate the production of electric energy, there is no indication in the constitution or in the statutes that supplying electric energy is a sovereign function of the State. Likewise, the production of electricity has not traditionally been considered a power or duty which is inherent in the sovereign. Rather, it was considered either a private business or a proprietary municipal function for the advantage of each community. *See Hite v. PUD 2,* 112 Wn.2d 456, 459, 772 P.2d 481 (1989).

Because of the increasing need for electrical energy, single PUD's or cities were no longer capable of developing energy resources for their communities. Consequently, joint operating agencies were authorized to perform this function. However, the increased need for electricity and the concomitant need for increasing participation by more individual PUD's and cities does not transform the development, production, and supply of electric energy into an exercise of a sovereign power of the State.

We hold the Supply System, in contracting with GE for the Nuclear Steam Supply System, was not acting "for the benefit of the state" within the meaning of RCW 4.16.160 because it was not exercising a delegated sovereign power. The certified question of the United States District Court for the Eastern District of Washington is answered in the negative.

CALLOW, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.