[Nos. 36809-5-I; 38387-6-I. Division One. July 21, 1997.]

NEIGHBORS & FRIENDS OF VIRETTA PARK, ET AL.,
*Respondents*, v. AURIE HOLLINGWORTH "HOLLY"
MILLER, *as Superintendent*, ET AL., *Appellants*.

*David D. Hoff, Michael D. Pierson,* and *Riddell Williams, P.S.*; and *Mark H. Sidran, City Attorney,* and *Miriam Reed, Assistant,* for appellants.

*James H. Webster* and *Webster Mrak & Blumberg,* for respondents.

KENNEDY, J. — The Neighbors and Friends of Viretta Park, an unincorporated voluntary association, and several individuals who live in the vicinity of Viretta Park (hereinafter referred to collectively as "Neighbors

and Friends") brought this lawsuit against the City of Seattle, its Parks Superintendent Holly Miller, and Howard and Sheri Schultz seeking declaratory judgment that vehicles are barred from the Viretta Park right of way, and that the City did not have the authority under the plat dedicating the Park to allow the Schultzes to utilize the Park right of way for vehicular access to their property. Neighbors and Friends also sought declaratory judgment that the City had breached its duty as trustee of the Park by not rebuilding the spur of the right of way that disappeared over 65 years ago, by not requiring the removal of a retaining wall that had been built over the spur, by considering exchanges of property with the Schultzes to resolve encroachments onto Park property, and by not charging the Schultzes a sufficient sum for the cost of removal of their encroachments and for the cost of restoring the spur to its original, 1901 condition. The trial court granted summary judgment in favor of Neighbors and Friends with respect to both sets of claims, in two separate orders entered nine months apart. The City, its Parks Superintendent and the Schultzes appealed each of the orders. This court linked the appeals for purposes of argument and decision.

We conclude that the trial court erred in entering both summary judgments in favor of Neighbors and Friends. As to the vehicular access claim, we reverse and remand for entry of summary judgment in favor of the City, its Parks Superintendent and the Schultzes in accord with their cross-motions because the City's decision to allow vehicular traffic on the Park right of way and to allow the Schultzes' predecessors to utilize the right of way for vehicular access to their property was made of public record in 1914 and Neighbors and Friends' challenge of that decision is time barred. Moreover, the City did not exceed its authority under the plat in allowing vehicles in the Park and in allowing the Schultzes and their predecessors to utilize the Park right of way for vehicular access to their property.

With respect to the spur of the Park right of way, we conclude that the City does have authority to consider an exchange of property to resolve the encroachments. Because we find no evidence of any breach of the City's trust with respect to the Park arising out of its dealings with the Schultzes or their predecessors, and because the trial court's ruling with respect to the spur effectively aborted the City's consideration of an exchange to resolve the encroachments, the encroachment issues were not ripe for judicial review. Moreover, Neighbors and Friends' claim with respect to the restoration of the spur that disappeared more than 65 years ago is barred by the doctrine of laches. Accordingly, we reverse and remand for such further proceedings as shall be consistent with this opinion.

## FACTS

In 1901, Charles and Viretta Denny executed the plat map for the Denny-Blaine Lake Park plat, in which they dedicated "to the use of the Public and the City of Seattle forever, all the streets, lanes, parks, fountains and places shown and described upon this plat,. . . [t]he said City at all times to maintain said parks, places and fountains." By ordinance, the City accepted the plat map as executed.

The dedicated plat contained 114 lots, as well as streets, fountains and several parks. One of those parks was Viretta Park, named after Viretta Denny. An unnamed public right of way is shown on the plat map, extending through the Park. It commences at 39th Avenue East across from the intersection of 39th Avenue East and East John Street, runs first in a southeasterly direction through the Park to the northern border of Lot 23 (which was owned by the Schultzes at the time this action commenced), then runs east along the northerly edge of Lot 23. At the northeastern corner of Lot 23 the right of way intersects with a long loop, one branch of which runs in a northwesterly direction to the southern boundary of Lot 24 of the plat and the other branch of which runs

northeasterly past another entrance to the Park located on Lake Washington Boulevard (designated as 40th Avenue on the plat map), eventually connecting up with the other branch of the loop at the southeast corner of Lot 24. At the northeast corner of Lot 23 where the right of way connects with the loop, a spur of the right of way heads south along the eastern edges of Lots 20 through 23 of the plat, ending at a dead end alongside of Lot 20.

The right of way varies in width. At the entrance from 39th Avenue East, the right of way is 25 feet wide. The portion leading directly to and skirting the northern side of the Schultzes' property is 8 feet wide. The remainder of the right of way is from 6 to $6^1/2$ feet wide, except where the right of way opens to Lake Washington Boulevard; there it is 12 feet wide.[1] The right of way is precisely called out by survey points, two of which are tied to three survey lines on the Park right of way. One survey marker is at the point where the Schultzes' 8-foot wide access drive intersects with the loop and the 6 to $6^1/2$ foot wide spur. That survey point is tied to similar points on 39th Avenue East and Lake Washington Boulevard. The second survey point is on the upper loop of the right of way south of Lot 24 and is tied to a similar point on Lake Washington Boulevard.

The portions of the right of way at issue in this appeal include that portion leading directly to the Schultzes' property from 39th Avenue East and that portion running east to the northeast corner of their property, and the spur running south along the eastern side of their property, ending at the dead-end alongside Lot 20. Throughout the remainder of this opinion, we will refer to the portion of the right of way leading to and skirting Lot 23 as the "access drive" and that portion running south along the eastern edges of Lots 20-23 as the "spur."

---

[1]The record reflects that the horse-drawn carriages common in 1901 were four feet wide. After viewing photographs of portions of the right of way taken from 1901-05, a paving expert opined that the right of way appears to be constructed of "a well-compacted aggregate or other substantial material," and "appears to be suitable for vehicle use in 1901, both in terms of its size and in terms of . . . materials[.]"

Lots 19 through 23 of the plat lie between the southwest border of Viretta Park and 39th Avenue East. The slope between lots 19-23 and 39th Avenue East is very steep, making vehicular access onto those lots directly from 39th Avenue East impossible. In 1914, at the request of the owner of Lots 22 and 23, the City's Board of Park Commissioners passed a resolution permitting the widening and use as a public highway of those portions of the right of way which we refer to as the access drive and the spur.[2] No appeal was taken from this decision. From that time forward, the owners of Lot 23 have used the access drive, which was paved in 1934, for automobile access to their property.[3]

Although the access drive from 39th Avenue East has been regularly used by the owners of Lot 23, by their neighbors and friends (including at least two of the people referred to in this opinion as Neighbors and Friends), by visitors to the Park and by the Parks Department for vehicular access, from 1914 to the present time, the spur eventually became covered with soil and a retaining wall was built in the Park, over the spur. In spite of vigorous discovery conducted in connection with this lawsuit, none of the parties knows or can prove how the spur came to be covered with earth or who built the retailing wall.[4] It is clear from the record, however, that the spur disappeared

[2] The spur reaches a dead end at Lot 20; Lot 19 to the immediate south of Lot 20 borders on platted but unopened Howell Street.

[3] Later that same year, 1914, the Board of Park Commissioners also approved the construction of a similar vehicle access drive along a different stretch of the right of way, for automobile access to Lot 24, which borders Viretta Park to the north. No appeal was taken from that decision.

[4] Neighbors and Friends, in an egregious misstatement of the evidence contained in the record, claims that the spur where the retaining wall is now located was eliminated in 1930 by F. G. Black, then the owner of Lots 19-23. But the evidence relied upon by Neighbors and Friends for this proposition actually shows that Mr. Black planted lawn over a footpath located on his own property, and not on the spur, because visitors to the park mistook that footpath for part of Viretta Park. We have considered imposing sanctions on Neighbors and Friends for this misstatement of the evidence, but have elected to treat the misstatement as something less serious than a deliberate effort to mislead this court. Accordingly, no sanctions will be imposed.

more than 65 years ago and that the retaining wall has been in place for approximately that same period of time. A steep slope lies between the eastern edges of Lots 20-23 and the spur.

In 1991, Howard and Sheri Schultz purchased and built a home on Lots 21-23. In anticipation of their purchase of the lots, apparently after consulting with a title insurer, the Schultzes contacted Superintendent of Parks Miller, requesting that they be able to use the access drive to reach their property, as had the predecessor owners of the property. Superintendent Miller responded:

> [T]he Department of Parks and Recreation recognizes that the owner of Lot 23 has a right to vehicular access to this lot along the lane through the park from 39th Avenue that is illustrated on the plat. It is my determination, based on the information available to me, that such access is consistent with the intent of the dedicators of the plat. Such access, however, must not interfere with the use of Viretta Park by the general public.
>
> This means that the Department of Parks and Recreation will allow a driveway that meets minimum standards, that is the minimum length and width necessary to accomplish its purpose, and that is maintained by the owner of Lot 23.[5]

The Schultzes purchased Lots 21-23 shortly after receiving this letter and began construction of a new home on the property.

The plans approved by the City for the new Schultz home show a previously-erected retaining wall in the Park to the east of Lot 23 property with the notation "Exist. Retaining Walls (to remain)." During construction, the Schultzes were permitted to use a portion of Viretta Park as a staging and storage area for construction purposes in

---

[5]The record reflects that in 1977, in response to a request from the Parks Department for a formal opinion regarding the Viretta Park right of way, the City Attorney opined that the dedicators of the park intended that the lots abutting the park drives have access over them, and that the owner of what is now the Schultz property could not be denied access to his home over the right of way leading from 39th Avenue East.

return for the Schultzes making improvements to the Park. In addition to building their home, the Schultzes made a number of changes to their property and to areas of Viretta Park adjacent to their property, including: improving the access drive; installing a fence and gate along their northern property line (later determined by survey to be partially on Park land); installing a cyclone fence (later determined by survey to extend into the Park); and replacing the top layer of wood on the pre-existing retaining wall.

In 1993, Neighbors and Friends contacted Parks Superintendent Miller regarding the Schultzes' encroachments in the Park. In response, the Superintendent called a public meeting, inviting neighbors in the Viretta Park area to comment on the Schultzes' recent renovations. As a result of a series of meetings, in April 1994, the Parks Board recommended to Superintendent Miller: that the area of the Park surrounding the Schultz property be made more readily discernible as public space and more welcoming to public use; that landscaping differentiate the public Park from the surrounding private property; and that the Schultzes' access drive be made to appear less intrusive. In May 1994, Superintendent Miller implemented plans which required the Schultzes to narrow the access drive, to pay for various uses of the Park, and to remove landscaping features, including fences and walls, which encroached on Park property.

Before any changes were made, Neighbors and Friends, in June 1994, filed this lawsuit against the Schultzes, the City of Seattle, Superintendent Miller and others,[6] contending that the Schultzes had widened the right of way for use as a private driveway, had encroached onto the Park, and that the Parks Superintendent and the City had acquiesced in these actions in violation of their public trust.

---

[6]The other defendants named in the complaint, the owners of Lots 19-20 and Lots 24-25 and the banks with interests in those properties, are not parties to this appeal.

In May 1995, Neighbors and Friends moved for summary judgment on the issue of vehicular access to Lot 23, contending that the Parks Board had exceeded its authority when, in 1914, it permitted the construction of the access drive along the Park right of way. Neighbors and Friends argued that the intent of the dedicators of the Park was to grant pedestrian, not vehicle, access through the park. The Schultzes and the City cross-moved for summary judgment. The motions were heard on June 9, 1995, and the court granted Neighbors and Friends' motion for summary judgment and denied the cross-motions of the defendants, stating, "[A]s a matter of law, . . . the plat of Denny-Blaine-Lake Park (the "Plat") does not grant the owners of Lot 23 as shown and described in the Plat a right of vehicle access to their property through Viretta Park." The Schultzes, the Superintendent and the City appealed from that order (cause number 36809-5) in June 1995.[7]

From the time that the Parks Superintendent implemented the Parks Board's recommendations with respect to the Schultzes' property until March 1996, the Schultzes prepared and submitted several proposals offering either to adopt parts of the Park and maintain them or to deed a portion of their property to the City in return for a roughly equal portion of Park property. While the City, having rejected the Schultzes' first proposal, was still considering their second proposal, Neighbors and Friends moved for summary judgment on the issue of the encroachments, contending that the Schultzes had maintained previously-existing encroachments and had created new ones physically barring members of the public from reaching segments of the Park. Neighbors and Friends sought a declaration that the City could not allow the Schultzes to encroach in the Park and an injunction requiring the City to: abate the private encroachments; restore the spur of the right of way to a pedestrian walkway; and charge the

---

[7]The trial court stayed the order pending the outcome of this appeal, and ruled that the order did not affect the owners of Lot 24 to the north of the park.

Schultzes for the encroachments and for the cost of removing them and of restoring the spur. The court granted Neighbors and Friends' motion. Although the City had, in the meantime, rejected the Schultzes' second property exchange proposal, at the time of the ruling it had not yet acted on the Schultzes' third proposal, which had been submitted on March 12, 1996, 16 days before the judge's ruling. The Schultzes, the Superintendent and the City again appealed (cause number 38387-6).

## DISCUSSION
### The Access Drive
### I

▮ In bringing this declaratory judgment action seeking a determination that automobile use of the public right of way through Viretta Park is unlawful and that the City had no authority to allow the right of way to be used for vehicular access to private property lying adjacent to the Park, Neighbors and Friends are attempting to overturn two 80-year-old resolutions of the Parks Board. Declaratory judgment actions challenging land use decisions "must be filed within a reasonable time as measured by an analogous statute of limitations." *Summit-Waller Citizens Ass'n v. Pierce Cy.*, 77 Wn. App. 384, 397, 895 P.2d 405, *review denied*, 127 Wn.2d 1018 (1995). No analogous statute of limitation allows 80 years to pass before an action must be brought.

▮ Neighbors and Friends argues, however, that no analogous statute of limitations applies to its claim because it stands in the shoes of the City and because RCW 4.16.160, providing that no statutory limitation period applies to actions brought in the name of or for the benefit of the state, is applicable to their claim. Neighbors and Friends insists that it is entitled to the protection of RCW 4.16.160 because it, and not the City, is acting on behalf of the sovereign. We disagree. An action is brought in the name or "for the benefit of the state" only if it is a municipal action arising out of powers traceable to the

sovereign powers of the state that have been delegated to the municipality. *WPPSS v. General Elec. Co.*, 113 Wn.2d 288, 293, 778 P.2d 1047 (1989). Moreover, Neighbors and Friends' depiction of itself as standing in the City's shoes is inconsistent with the real posture of this case. Neighbors and Friends is acting for its members, not for the City. The City is, in fact, defending itself against Neighbors and Friends' lawsuit. No court has ever held that citizens *suing* a municipality get the benefit of RCW 4.16.160, and we decline to do so.

■ Indeed, statutes of limitation apply to taxpayer lawsuits. *See, e.g., Kendall v. Douglas Counties Pub. Hosp. Dist. 6*, 118 Wn.2d 1, 820 P.2d 497 (1991) (appellants suing on behalf of area taxpayers could not challenge approval of hospital district because limitations period had run); *Kemp v. Lynch*, 86 Ohio App. 371, 92 N.E.2d 18 (1949) (taxpayer action to recover money paid by municipality to defendant subject to applicable statute of limitations); *Schaefer v. Berinstein*, 180 Cal. App. 2d 107, 4 Cal. Rptr. 236 (1960) (statute of limitations barred taxpayer challenge to municipal transactions with municipality's former legal counsel).

■ Finally, there is a strong public interest in providing for and enforcing finality of governmental decisions like the 80-year old decisions of the Parks Board in this case. *Cf. Deschenes v. King Cy.*, 83 Wn.2d 714, 717, 521 P.2d 1181 (1974) (purpose of time limitations in land use matters is to give finality; if there were not finality, no owner of land would ever be safe developing his property).

■ Neighbors and Friends' claim is also barred by the doctrine of laches. "Laches is an implied waiver arising from knowledge of existing conditions and acquiescence in them." *Buell v. City of Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972). Laches bars a cause of action where there is: (1) knowledge by plaintiffs of the facts constituting their cause of action or a reasonable opportunity to discover such facts; (2) unreasonable delay in commencing the action; and (3) damages to the defendant resulting from the

delay. *Davidson v. State*, 116 Wn.2d 13, 25, 802 P.2d 1374 (1991). Neighbors and Friends challenges only the third of these elements. It contends that the Schultzes have not been damaged by the delay in bringing the claim because they were on sufficient notice, before purchasing their property and building their home, that questions might arise regarding their right to the use of the access drive— witness their inquiry to the City regarding that same right. Thus, Neighbors and Friends argues, any harm suffered by the Schultzes is their own fault and is not based on the delay of Neighbors and Friends in bringing the lawsuit. We disagree.

The City, in justifiable reliance on the 80-year old resolutions of the Parks Board and the 1977 opinion of the City Attorney assured the Schultzes that they had, in effect, a perpetual license to utilize the access drive for vehicular access to their property. The City had no reason to believe that the 1914 decisions of the Parks Board would ever be challenged, and the Schultzes had every reason to rely upon Superintendent Miller's assurance of the continued right to access. It is undisputed that the Schultzes would not have purchased the property and built their new home if they had not been given that assurance. The third element of the laches doctrine has been amply demonstrated.[8] We conclude that the claim with respect to the access drive is time barred.

## II

 We also reverse the trial court's summary judgment order with respect to the access drive on grounds that are entirely independent from Neighbors and Friends' delay in bringing the claim. Although the dedicators' intent controls the meaning of a plat, *Roeder Co. v. Burl-*

---

[8]Neighbors and Friends also argues that because it stands in the shoes of the City, and because courts will not apply equitable estoppel against the government when it would interfere with the proper discharge of governmental duties, the doctrine of laches does not apply to its claim. Having rejected Neighbors and Friends' contention that it stands in the shoes of the City, we will not address the contention again in this context.

*ington N., Inc.*, 105 Wn.2d 269, 273, 714 P.2d 1170 (1986), and although the dedicators may limit the use of a public way to pedestrians only, to place a restriction on the use of dedicated property the dedicators must use language clearly indicating an intent to do so. *King Cy. v. Hanson Inv. Co.*, 34 Wn.2d 112, 119, 208 P.2d 113 (1949). Specifically, if the grant of a right of way does not contain an express restriction, it may be adapted to vehicle use even if it was initially used exclusively by pedestrians. *See, e.g., Albee v. Town of Yarrow Point*, 74 Wn.2d 453, 458, 445 P.2d 340 (1968); *Logan v. Broderick*, 29 Wn. App. 796, 800, 631 P.2d 429 (1981). The Denny-Blaine Lake Park Plat does not affirmatively prohibit vehicles on the Park right of way. Additionally, the plat map contains markings indicating that the Dennys expected the right of way to be used for vehicular traffic. First, the right of way opens onto named city streets at either end and widens at its intersection with those streets. *See Mueller v. City of Seattle*, 167 Wash. 67, 71, 8 P.2d 994 (1932) (where long narrow strip was open at each intersection with plat's named streets, dedicators intended unnamed strip to be a street); *Olson Land Co. v. City of Seattle*, 76 Wash. 142, 145, 136 P. 118 (1913) (if irregular plat had not been intended as part of a dedicated street, dedicators would have drawn a solid line between it and the street). *Compare Frye v. King County*, 151 Wash. 179, 185-86, 275 P. 547, 62 A.L.R. 476 (1929) (where street ends were enclosed by lines marked on plat, dedicators did not intend extension of street beyond those lines). Here, the Park right of way as shown on the plat map is open at its intersections with 39th Avenue East and with Lake Washington Boulevard.

We also observe from the face of the plat map that the Dennys showed the right of way through the Park by way of continuous parallel black lines of the same thickness and quality of the lines showing the named city streets, and that portions of the right of way lead directly to lots within the plat that cannot be accessed by vehicle, be it horse and buggy or automobile, except by means of the public right of way through the Park, due to the steepness

of the terrain separating the lots from the named public streets. In Washington, courts will presume that plat dedicators intend to provide convenient access to all lots in the plat. *See, e.g., Nelson v. Pacific County*, 36 Wn. App. 17, 21, 671 P.2d 785 (1983) (courts presume dedicator intended to provide access to streets and water).

The right of way is indisputably wide enough to accommodate the horse drawn carriages that were predominant in Seattle in 1901, and the widening of the right of way where it intersects with 39th Avenue East and Lake Washington Boulevard seems intended to give vehicles room enough to negotiate the turns into the Park from the named streets, and certainly serves that purpose.

Although it is true that the right of way is not wide enough in most places to accommodate two carriages or automobiles passing abreast, the record reflects that platted vehicular alley ways all over Seattle are barely wide enough for one lane of traffic. This width suffices because alleys serve mainly a few adjacent landowners. The Viretta Park right of way serves far fewer homes than a typical alley. Moreover, the Park is less than two acres in size. Expected pedestrian use alone would not seem to justify a right of way six to eight feet wide extending hundreds of feet through the Park.[9]

█ The plat document itself is the best evidence of the dedicators' intent, which is to be deduced, when possible, from the face of the plat, including all the marks and lines appearing on it. *Roeder Co.*, 105 Wn.2d at 273. Extrinsic evidence may not be used to contradict an

---

[9]The record reflects that the Dennys were greatly influenced by the work of landscape architect Frederick Law Olmstead and by the City Beautiful movement which he inspired. A key tenet of Olmstead and City Beautiful was that beauty and utility were inseparable. Olmstead was especially adept at designing roads and driveways to blend into the landscape and often created multiple-use parks and park drives combining driveways, bridle paths, footpaths and bicycle paths. The Denny-Blaine Lake Park Addition plat map shows the Olmstead influence. The long, curving streets and spacious lots follow the natural contours of the land. Several parks dot the development and all features are woven together to create "a parklike appearance; in fact making it impossible to tell where private property ends and park property begins, so much in harmony is the general line of improvement."

unambiguous plat or to create an ambiguity. *Selby v. Knudson*, 77 Wn. App. 189, 194, 890 P.2d 514 (1995). We do not find the Denny-Blaine Lake Park plat to be ambiguous with respect to the intent of the dedicators to allow vehicles onto the Park right of way and to allow vehicular access to the lots adjacent to the Park by means of the Park right of way. The plat contains no restrictions on the use of the right of way, in words, or by the way that the right of way is drawn on the plat map, or by reason of the width of the right of way. Moreover, the right of way as drawn on the map leads directly from 39th Avenue East to Lot 23, and leads directly from Lake Washington Boulevard to Lot 24 before looping through the center of the Park, and provides the only feasible access to those lots from the named streets adjacent to the Park. It is difficult to conceive why this would be so if the right of way were not intended to provide vehicular access that can be had no other way.

We conclude that the trial court erred in interpreting the plat to restrict vehicles from entering the Park and in concluding that the City had no authority, in 1914, to allow the owners of Lot 23 abutting the southwestern portion of the Park (or of Lot 24 abutting the northeastern portion of the Park) to widen the right of way to accommodate automobiles, with the arrival of the automobile age.[10]

In sum, we conclude that the trial court erred in granting summary judgment in favor of Neighbors and Friends and by denying the cross-motions of the City, its Parks Su-

---

[10]Although we reach this conclusion on the basis of the plat map and controlling case law, ample extrinsic evidence supports the conclusion as well. In 1914, E. F. Blaine, the Dennys' codeveloper of the plat, owned Lot 24 and obtained automobile access to his home by the same means that automobile access was obtained by the owner of Lot 23: by resolution of the Parks Board. By 1914, the automobile age had arrived in Seattle. Charles and Viretta Denny owned an automobile. Viretta Denny, who lived until the 1950s, frequently drove by the park that bears her name and must have been aware that vehicles were entering the park. A surviving relative who knew her well testified by declaration that if Viretta Denny had not intended that the right of way be open to vehicular traffic, she would have had no hesitancy in making this known to city authorities.

perintendent and the Schultzes for summary judgment in their favor with respect to the access drive.

## The Encroachments
### Restoration of the Spur

The trial court ordered the City to remove the retaining wall that was built over the spur some 65 years ago, and to restore the spur to its 1901 condition, at the expense of the Schultzes. This was error. First, it is entirely unknown who built the retaining wall over the spur. The Parks Superintendent believes that the City may have built it, perhaps due to slides of earth from the uphill lots onto the spur. Given the terrain immediately above the spur (described by City witnesses as dangerously steep), Seattle's winter weather patterns and the terrible losses experienced in the Pacific Northwest as recently as this past winter due to slides, this is a reasonable inference. It is, of course, also possible that predecessor owners of the lots uphill from the spur built the wall, with or without the knowledge and approval of the City. Nobody knows, and after the passage of more than 65 years, nobody is likely ever to discover why the retaining wall was built over the spur or who built it. Assuming for the moment that the disappearance of the spur some 65 years ago was because of some violation of the City's trust obligation to maintain the Park, Neighbors and Friends claim as a beneficiary of the trust that the spur must be restored to its 1901 condition is nevertheless barred by the doctrine of laches: "The beneficiary cannot hold the trustee liable for a breach of trust if he fails to sue the trustee for the breach of trust for so long a time and under such circumstances that it would be inequitable to permit him to hold the trustee liable." RESTATEMENT (SECOND) OF TRUSTS § 219 (1959). *Accord Davidson*, 116 Wn.2d at 26-27 ("The doctrine of laches commonly recognizes the unavoidable loss of defense evidence as establishing material prejudice. The 62-year delay in challenging the 1921 harbor lines deprived the State of substantial evidence. All those who

surveyed, drew, and established the harbor area are now deceased. Expert witnesses for both sides were unable to discover any first-hand documents setting forth the basis for the placement of the lines." (citations omitted)).

Additionally, RCW 35.22.280(7) empowers cities of the first class such as Seattle to open, alter, and vacate streets, parks and other public grounds, as well as to establish and alter grades on public grounds. In the dedication contained on the plat map, the Dennys dedicated "to the use of the Public and the City of Seattle forever, all the streets, lanes, parks, fountains and places shown and described upon this plat . . . [t]he said City at all times to maintain said parks, places and fountains." When interpreting substantially identical language in *Rainier Ave. Corp. v. City of Seattle*, 80 Wn.2d 362, 367, 494 P.2d 996, *cert. denied*, 409 U.S. 983 (1972) our Supreme Court said:

> The ultimate issue here is whether the dedicator intended to dedicate the park streets independently of the park or whether it was his intent—and better public policy—to recognize that the fee in the area covered by the vacated street is subject to two easements, a public easement for street purposes and a public easement for park purposes. Under such latter construction, a vacation of the street easement leaves the fee subject to the easement for park purposes. The street vacation merely removes that particular burden and leaves the park unencumbered by the street easement, but still in existence as a park.

Thus, the court concluded that the vacated street at issue in the case had not reverted to the fee owner, in that the fee was still encumbered by the easement created by the Park dedication. The court reasoned that this interpretation properly balanced private rights and the public interest. *Rainier Ave. Corp.*, 80 Wn.2d at 367-68.

Although we deal here with a claim that the City has violated its public trust by failing to restore the spur, rather than a claim that the spur has reverted to the heirs of the dedicators by reason of a constructive vacating or an abandonment of the spur by the City, still,

the same underlying principles apply. In construing the nature of the City's duty as trustee of the Park, we must look to the City's statutory authority to deal with public grounds as well as to the intent of the dedicators. We do not believe that the City loses its statutory authority to alter or to vacate a street merely because it is platted into a park. So long as the dedicated park itself is maintained for park purposes, particular lanes, paths, grades or other physical aspects of the park do not necessarily need to be maintained in their original condition in perpetuity to prevent reversion to the dedicators or their heirs. By that same token, the City's trust obligations do not necessarily require that particular lanes, paths, grades or other physical aspects of the park be maintained in their original condition in perpetuity. This is particularly true of portions of a right of way that might become dangerous for public use due to slides, which by reasonable inference may very well be the case with respect to the spur.

Our reasoning is consistent with *Burg v. City of Seattle*, 32 Wn. App. 286, 647 P.2d 517 (1982). There, a landslide obliterated a street. The City found the repair work feasible, but too costly in light of budget constraints, and did not repair the street. The residents sued, but the court said: "[W]e find no duty clearly imposed on the City of Seattle to repair or restore the damaged portion of [the street.] Further, the decision whether to repair the street in question, how to repair it or not to repair it at all is a discretionary decision not subject to judicial invasion." *Burg*, 32 Wn. App. at 296; *see also State ex rel. Grinsfelder v. Spokane St. Ry. Co.*, 19 Wash. 518, 532, 53 P. 719, 67 Am. St. Rep. 739 (1898) (No dedication is good, under all the authorities, which attempts to take from the public authorities their full power and control over streets.).

By dedicating Viretta Park to the City of Seattle the Dennys did not and could not remove the City's discretion to deal reasonably with the right of way shown on the plat map, in light of changing conditions within the Park. By ordering the City to restore the spur to its origi-

nal condition, the trial court not only invaded the City's discretionary powers, it also made a management decision for the City without the kind of engineering, ecological and planning information that the City, as trustee of the Park, must have in order to determine whether restoring the spur is financially feasible and consistent with the public safety. Moreover, by ordering that the Schultzes pay for the cost of removing a retaining wall that may very well have been placed in the Park by the City itself, and that cannot be shown to have been placed by any prior owner of the Schultzes' property in any event, the trial court violated fundamental principles of due process.

## Removal of Schultzes' Encroachments

Although nobody knows who built the retaining wall over the spur, it is clear, as the result of subsequent surveys, that some of the landscaping and fencing placed by the Schultzes while building their new home encroach onto Park property. While the Schultzes and the City were still negotiating the possibility of an exchange of Park property for Schultz property to cure the encroachments, the trial court entered the second order of summary judgment, effectively halting the negotiations and effectively ordering the City to resolve the encroachments in only one way: by removing the encroachments at the Schultzes' expense. Such order would be appropriate only if the City had no power to enter into an agreement for an exchange of Park property for Schultz property; otherwise, the controversy was not ripe for judicial review.

RCW 35.22.280(11) specifically empowers cities of the first class to exchange Park property for private property which shall then be impressed with the same trust as the exchanged park property. Where the language of the dedication of the Park contains a reservation of interest in favor of the grantor, the statute provides that the City may nevertheless make the exchange with the consent of the grantor or his heirs or successors. Where, owing to the

lapse of time, no such heirs or successors can be located, the City may file an affidavit setting forth its efforts to locate such heirs or successors, and then may enter into the exchange without the necessity of consent.

In addition, RCW 35.22.570 provides cities of the first class with all the powers of cities and towns of a lesser class. Where there has been no reservation of interest in favor of the grantor of parkland, cities of the second class can exchange Park property with the grantor's consent or that of his heirs or successors, or without that consent where, due to the lapse of time, no such heirs or successors can be found. Thus, although only cities of the first class can exchange Park property for private property where there has been a reservation of rights, both classes of city can enter into such exchanges where there has been no reservation of rights. The parties dispute whether the dedication of Viretta Park contains a reservation of rights. We need not resolve the issue because we conclude that the City, as a city of the first class, and having all the powers of a city of the second class as well, has the authority to enter into agreements for the exchange of Park property where the public interest will be served thereby, with the consent of any heirs or successors that may be found, under either of these Park property exchange statutes.

Accordingly, the City was acting within its trust obligations in considering the Schultzes' exchange proposals.

Although we find no indication in the record that the City has as yet contacted or attempted to contact the dedicators' heirs or successors with regard to an exchange, any such effort would seem to be premature until such time as the City might find an exchange proposal to be acceptable. As of the time of the second summary judgment, the City had rejected two such proposals, but was still considering the third proposal, received 16 days before the date of the ruling.

Before a court may rule by declaratory judgment, a justiciable controversy must exist. *Walker v. Munro*, 124 Wn.2d 402, 411, 879 P.2d 920 (1994).

For declaratory judgment purposes, a justiciable controversy is: (1). . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

*Walker*, 124 Wn.2d at 411 (citations omitted).

Put another way, a claim is ripe for judicial determination if the issues raised are primarily legal and do not require further factual development, and the challenged action is final. *First Covenant Church v. City of Seattle*, 114 Wn.2d 392, 400, 787 P.2d 1352 (1990), *adhered to on remand*, 120 Wn.2d 203 (1992). The rationale for the requirement of a justiciable controversy is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and to protect agencies from judicial interference until an administrative decision has been finalized. *Abbott Lab. v. Gardner*, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967).

Here, the administrative decision as to the resolution of the encroachments had not been finalized. Although we observe that the City had been working with the Schultzes and with Neighbors and Friends for close to four years without reaching a final administrative decision with regard to the encroachments, we also note that the issue of the encroachments that admittedly were placed by the Schultzes became entangled with the issue of the 65-year-old retaining wall over the spur, and with the controversy over the City's authority to consider a property exchange, as well as with the issues regarding the access drive. In the meantime, the City timely responded to citizen concerns by holding public hearings and did apparently succeed in getting some of the encroachments placed by the Schultzes removed. With our resolution of the issues

regarding the access drive and the retaining wall over the spur, and our confirmation of the authority of the City to entertain a property exchange with the Schultzes, we expect that the matter of the encroachments placed by the Schultzes will become more readily resolvable.

Be that as it may, the controversy regarding the encroachments placed by the Schultzes in building their new home was not ripe for judicial review at the time of the second order of summary judgment. Accordingly, we reverse. In doing so, we do not wish to imply that Neighbors and Friends does not have an interest in the prompt resolution of the problem of the encroachments placed by the Schultzes. It most certainly does have such an interest, and we believe that the trial court has the authority, upon a proper showing of figurative foot-dragging, to set reasonable time limitations on continued negotiations with respect to the encroachments placed by the Schultzes. We do not consider the delays to the time of the second summary judgment hearing to constitute a breach of the City's trust obligations with respect to management of the Park, however, given the entangle-ment of issues that gave rise to this appeal. We do caution the parties, however, that judicial intervention might become warranted in the face of any future unreasonable delays in entry of a final administrative decision.

## CONCLUSION

With respect to the first order of summary judgment, that relating to the access drive, we reverse and remand for entry of summary judgment in favor of the Schultzes and the City on two independent grounds: Neighbors and Friends' challenge to the City's 1914 decision to allow vehicles into the Park and to allow the owners of Lot 23 to gain vehicular access to their property over the Park right of way is time barred. Moreover, the face of the plat map indicates as a matter of law that the Dennys intended to allow vehicles in the Park and to allow the Park right of way to be used for vehicular access to their properties by, at the very least, the owners of Lots 23 and 24.

Neighbors and Friends' claim with respect to removal of the retaining wall and restoration of the spur to its 1901 condition is barred by the doctrine of laches. Moreover, the City did not violate its trust obligations by failing to remove the wall and restore the spur and the trial court overstepped judicial bounds by ordering the City to take that action. The City, and not the court, is charged with management decisions relating to the Park.

The issues with respect to the encroachments placed by the Schultzes while building their new home were not ripe for judicial determination at the time of the second summary judgment.

Both orders of summary judgment are reversed and remanded for such further proceedings as shall be consistent with this opinion.[11]

BAKER, C.J., and COLEMAN, J., concur.

Review denied at 135 Wn.2d 1009 (1998).

---

[11]Our disposition makes it unnecessary to reach the issue, raised by the Schultzes, regarding the trial judge's unannounced, unaccompanied visit to the Park while the first summary judgment was pending. Although we strongly discourage unannounced, unaccompanied site visits, any misperceptions of the evidence that may have resulted from the visit have been resolved by our reversals. We reject the contention that the appearance of fairness requires that we order that another judge preside over the lawsuit following our remand.