**Mildred DANIELS and Maurice Daniels, her husband, Plaintiffs,**

v.

**COUNTY OF ALLEGHENY, Defendant.**

**Civ. A. No. 11189.**

United States District Court
W. D. Pennsylvania.
Sept. 26, 1956.

Fingold & Fingold, Pittsburgh, Pa., for plaintiffs.

William A. Challener, Pittsburgh, Pa., for defendant.

WILLSON, District Judge.

This is a diversity case. Plaintiffs are husband and wife. Defendant is the County of Allegheny. While plaintiffs were visiting the Greater Pittsburgh Airport on Sunday, October 19, 1952, plaintiff Mildred Daniels received serious injuries when she fell while walking along a passageway leading from the Administration Building to the automobile parking lot. The jury gave her a verdict in the sum of $2,000. In the same verdict the jury awarded her husband, plaintiff Maurice Daniels, the sum of $3,000. Judgments have been entered on the verdict. Defendant has moved for judgment notwithstanding the verdict and in the alternative for a new trial.

■■ Familiar principles apply to a consideration of the issues raised in defendant's motion. Plaintiffs are entitled to all the evidence which is most favorable to them, together with all reasonable inferences therefrom; and if there are any conflicts in the testimony, such conflicts must be resolved in their favor. Coradi v. Sterling Oil Co., 378 Pa. 68, 105 A.2d 98. Also, this being a motion for judgment n.o.v., plaintiffs must be given the benefit of every fact and inference of fact pertaining to the issues involved which may reasonably be deduced from the evidence. See Downey v. Union Paving Co., 3 Cir., 184 F.2d 481.

■ In considering the motion for judgment n.o.v., the principles are the same in both the state and federal courts. However, the substantive law of Pennsylvania controls. The basic issue is whether there is evidence in the record to support the verdict on those issues of fact; first, whether or not the step at the end of the passageway leading from the Administration Building to the parking lot was properly or negligently constructed and maintained; and second, whether the wife plaintiff was guilty of contributory negligence.

■ At the outset, however, it must be determined whether the operation of the Greater Pittsburgh Airport by the County of Allegheny is a governmental or proprietary function. One of the defenses raised is that the County of Allegheny is not liable for torts committed at the Greater Pittsburgh Airport. This issue was raised at the pretrial of the case. It was not ruled upon at that time but the court indicated that the case should be tried as under the facts developed and undisputed at the pretrial as to the character of the operation at the airport, the court was of the opinion that the County of Allegheny was con-

ducting a business function and thus was under the general rule that a municipality carrying on a proprietary function is responsible in tort. This issue was not left to the jury.

The evidence introduced at the trial strengthens this court's preliminary view that under Pennsylvania law the County of Allegheny in the operation of the Greater Pittsburgh Airport is engaged in a business enterprise and therefore responsible to the plaintiffs in this case if negligent. The facts as to the operation of the airport are not in dispute. The record shows that the airport was constructed by the defendant in Moon and McCandless Townships, Allegheny County, Pennsylvania, and opened to the public in June of 1952. It consists of landing field, automobile parking lots and an Administration Building. The area comprises approximately 1,600 acres; each of two parking areas provide space for 1,250 automobiles; the Administration Building contains 480,000 square feet. In this building is situate a sixty-two room hotel, a theater, night club, refreshment stands, restaurants, amusement center, drug store, gift shops, and a branch of one of Pittsburgh's leading department stores. In this building also the various airlines maintain their ticket offices, information bureaus and other facilities for passengers and employees. From the entire area the defendant county retains for itself for administrative purposes about 8,000 square feet of space. The gross income received by the county for six months in 1952 gives some indication of the magnitude of the enterprise. The field revenue from June 1, to December 31, 1952, was $169,028.87; the Terminal Building yielded $358,415.32; the airport area, including the parking lots, dwellings, etc., brought in the sum of $94,842.68. There is one enterprise which the county directly operates which is profitable as a revenue producer, and that is the observation deck or platform. A portion of the Terminal Building is set aside for admittance through turnstiles upon payment of a charge of 10 cents per person, where individuals have a clear view of the landing field. In the six month period of time mentioned, the county realized from the observation deck the sum of $49,946.58. It is conceded that all the revenue has increased annually since the airport opened. Under the circumstances presented here, the county is engaged in a business enterprise which grosses hundreds of thousands of dollars annually and which is predominantly proprietary rather than governmental.

No Pennsylvania decision has been cited which exonerates a county from tort liability when engaged in a proprietary function. The defendant, however, points to a decision, Wentz v. Philadelphia, 301 Pa. 261, 151 A. 883, to the effect that the development of an airport is a public function under modern life as it is essential if a municipality seeks increased prosperity through air commerce. The decision, however, was concerned with the legality of the expenditure of funds for airport purposes and does not touch upon the present problem.

Both parties cite Hartness v. Allegheny County, 349 Pa. 248, 37 A.2d 18, decided by the Supreme Court of Pennsylvania on April 20, 1944. In that decision Mr. Chief Justice Stern discusses the liability generally of municipalities and comes to the conclusion that the controlling question is whether the predominate nature of the activities carried on is in the performance of a governmental function or a proprietary function. Neither in that case nor in any case cited is the county excused from liability for torts solely because it is an arm of the state government. The general rule is applied in the Hartness case and also in Bell v. City of Pittsburgh, 297 Pa. 185, 146 A. 567, 64 A.L.R. 1542, where a person injured by the negligence of an elevator operator in the City-County Building was held entitled to recover not only from the City but also from the County of Allegheny. The court says in the Hartness case, in explaining the Bell v. City of Pittsburgh decision, that it was based upon the fact that the county and city had erected and maintained the

building as a joint enterprise and therefore were obliged to share a joint liability in connection with its maintenance. It further said: " ' * * * there can be no doubt that the city in many of its departments was engaged in purely business enterprises in this building, notably the water business' ". See 349 Pa. at page 254, 37 A.2d at page 20 of the Hartness case.

Considering then that the defendant county in this instance receives hundreds of thousands of dollars of income annually from activities which historically and presently cannot be considered as within the realm of governmental function, such as the hotel, theater, night club, restaurants, observation deck, it would be an anomaly in the law to absolve defendant county from liability merely because it is an arm of the state government.

### Motion for Judgment Notwithstanding the Verdict.

Considering the evidence in the light most favorable to the plaintiffs, they are entitled to the benefit of the following facts: plaintiffs are residents of the State of New York and on October 19, 1952, a clear fall day, they were visiting the Pittsburgh area. They had not previously been to the Greater Pittsburgh Airport. Plaintiffs and five other persons arrived at the airport's west parking lot by automobile at about 11:30 a. m. The parking lot was constructed to park 1,-250 automobiles. The car was parked and plaintiffs and the others walked toward the northwest corner of the Terminal Building, which is the main airport building, called either Terminal Building or Administration Building. To reach the northwest entrance of the building from the parking lot it is necessary to walk over a passageway running from the southeast corner of the west parking space to the northwest corner of the Terminal Building. This passageway on the airport plans is styled a pedestrian bridge, but is commonly called a ramp. Underneath it is a vehicular roadway which runs past the corner of the building. This bridge or ramp is 80 feet in length. It is 8 feet wide. It has side walls of concrete which are approximately at shoulder height as one enters the ramp, but because the ramp slopes upward for one-half its distance to the building and then levels off the rest of the distance, the top of the side walls though on a horizontal plane reach approximately waist high to the average person walking from the parking lot to the west entrance of the building. From the surface at the corner of the parking lot there is a step upward to reach the end of the ramp. The step is shown on defendant's Exhibits A and B offered by plaintiff. The step is the same width as the ramp. At the right side on entering it is 7⅝ inches in height and at the left side on entering the ramp it is 10⅝ inches in height. It is this step which caused the fall resulting in the injuries to the wife plaintiff. The time was a Sunday afternoon within a few months of the airport's opening. In entering, the wife plaintiff ascended the step without incident. Plaintiffs and the rest of their party visited in and about the airport building for four hours on a general sightseeing tour, spending a considerable portion of their time on the observation deck. On leaving the building, plaintiffs' party became separated because of the crowd coming in and going out. The wife plaintiff and a Mrs. Hitchcock walked out of the building together and about five rows of people behind them were the plaintiff Daniels and the host of the party, one Homer Mills. People were jam-packed in the passageway. Mr. Mills stated that the crowd was just as close " * * * as you could get in a crowd without walking all over anybody," nevertheless the crowd was orderly; there was no pushing or shoving. The width of the ramp was filled, people on the right side going out and people on the left side coming in. The witness Mills stated that the walkway could not be seen as one walked along; that if one person moved his head forward he would put it on the shoulder of the person in front of him. As the wife plaintiff approached the end of the ramp she was not aware of the step, did not see it, and as a consequence

fell to the ground, receiving injuries for which the suit was brought.

As mentioned, the airport was built to accommodate and did and does attract large numbers of people. Plaintiffs charged negligence on the part of defendant in the design, construction and maintenance of the step at the entrance to the parking lot. In using a private automobile, one must park in the parking lot, the customary one being the west parking lot, as the east one is used for the employees and other persons connected with the various enterprises at the airport. To reach the Terminal Building from the west parking lot the natural and customary way is over the pedestrian bridge into the west end of the building.

Plaintiffs were permitted to introduce expert testimony of the witness Clifford A. Lake, a professional architect and registered engineer. Under the circumstances presented in this case, the expert witness on the part of the plaintiffs was permitted to testify as to sound architectural and engineering practice in connection with the construction of walkways near and at buildings. He testified as to the physical facts as shown by the plans and on the ground and then was permitted to testify as to how the ramp could have been constructed so as to have eliminated the step at the place where it joined the parking lot. He was not asked and did not testify as to whether the step as it existed on the day in question was dangerous. On the facts recited the jury found for plaintiffs.

■ The testimony of plaintiffs' expert witness was received over the strong objection of defendant. The basis of the objection was that the matter was not the subject of expert testimony. In permitting this evidence the court followed the decision in Ferreira v. Wilson Borough, 344 Pa. 567, 26 A.2d 342, in which the Supreme Court of Pennsylvania permitted expert testimony on an issue as to whether a crossing or drain had been properly or negligently constructed and maintained. From the evidence presented in this case, particularly the plan, the two photographs offered by the plaintiff,

and the testimony as to the crowds that visit the airport, one is struck by the fact that the step exists at all as it does at the end of the ramp. It seems needless under all of the evidence. The ramp might easily have been extended so that the walkway continues to slope until the ground and the walkway merge without an abrupt step. Crowds of people are jam-packed and funneled through the passageway on a busy day. It is felt that under the circumstances the testimony of the witness was permissible. Defendant cites Burton v. Horn & Hardart Baking Co., 371 Pa. 60, 88 A.2d 873, in which the Supreme Court of Pennsylvania held like expert testimony was inadmissible. In the instant case, however, it is believed that the expert testimony was of assistance to the jury. The contention by the defendant was that the step was necessary because of drainage and the unevenness of the ground. The expert indicated or pointed out how that situation could be overcome without a step. But equally important, plaintiffs' expert pointed out that present day engineering practice was to eliminate steps on ramps, walkways and other areas not immediately adjacent to buildings or curbs.

■ Defendant cites many decisions relating to sidewalk and step cases. Most of them relate to entrances into buildings, and have but little bearing upon the facts presented here. For instance, defendant cites Wessner v. Blue Ridge Trans. Co., 338 Pa. 161, 12 A.2d 559, 560, a case in which the plaintiff was injured when she fell from a platform in leaving a toilet compartment. The court held that there was no negligence in the construction. The court made the statement that the same construction was used in many of the large office buildings and department stores in the city and throughout the country, and stated: " ' * * * Common observation is enough to satisfy us that the defendants' rest room did not deviate from the standard customarily regarded as requisite by other reasonably careful persons under like circumstances: * * *.' " In the

instant case it is sufficient to say that this court's observation is that under the circumstances in this case it was a jury question whether the step at the end of the ramp did or did not deviate from the standard customarily regarded as reasonable. It is, of course, realized that the county in this case had a discretion as to method and material, but was limited by the requirement that it was to furnish a reasonably safe way and need not use the best material nor the best method of construction. Miller v. City of Philadelphia, 345 Pa. 1, 25 A.2d 185.

But, a reasonably safe way in the case before me must take into consideration the crowded conditions and the almost impossibility of observation when the passageway is congested with people moving both ways over the pedestrian bridge. On the issue of defendant's negligence, the verdict of the jury will not be disturbed.

*On Issue Whether Wife Plaintiff Guilty of Contributory Negligence.*

■ Defendant strongly urges under familiar principles of Pennsylvania law that Mrs. Daniels, having ascended the step some four hours previous to her injury, was guilty of contributory negligence at the time she was injured under her own testimony. It is believed that she did not recall the step as she approached the end of the ramp, neither did she see it. It is a close question under Pennsylvania law as to whether Mrs. Daniels was guilty of contributory negligence. However, at the trial and now this court is convinced that the facts presented a jury question on the issue of her own negligence.

Defendant cites Wessner v. Blue Ridge Trans. Co., supra, as authority for the proposition that this court must declare that the wife plaintiff was contributorily negligent as a matter of law. The key to the decision in the case cited is the following sentence: " ' * * * On leaving, had she looked before plunging blindly into space, she must again have seen the floor below.' " And also, " ' * * * Her duty required her to ob-serve what was so clearly visible.' " The facts in the Wessner case are far removed from the factual situation in the instant case.

In Hellriegel v. Kaufmann & Baer Co., 337 Pa. 149, 9 A.2d 370, also relied on by defendant, the plaintiff was injured while leaving the store by a dimly lighted exit which was unfamiliar to her. In so doing, she paid no attention to her surroundings or the other people around her and she fell down an unobserved step. In the opinion the court said:

" * * * Her own version of the accident conclusively shows that she substituted her past experience, in leaving the store by a doorway leading directly to the sidewalk, for the greater vigilance and care required by her use of an exit with which she was not familiar. Such lack of proper care convicts her of contributory negligence: Fordyce v. White Star Bus Lines, 304 Pa. 106."

The last mentioned case differs on its facts in great degree from the issue presented by Mrs. Daniels' case. Plaintiff Hellriegel was leaving a building by an exit. Mrs. Daniels was 80 feet from the building. Had she fallen at the building exit, no doubt the case would be ruled by the Hellriegel v. Kaufmann & Baer decision. In the instant case Mrs. Daniels was in the passageway where her only movement was forward with the crowd. It is true that Mrs. Daniels like plaintiff Hellriegel should perhaps have been aware that persons ahead of her were descending the step, but the step in the instant case is but 7⅝ inches in height on one end, and 10⅝ inches in height on the other end, and there is but one step, whereas several steps appear in the Hellriegel decision. It is not believed that the cases which defendant cites on this issue are controlling. It seems to this court that to hold Mrs. Daniels negligent is to require her to recall and remember the step which she used four hours previously. The issue as to whether she should have remembered the step was left to the jury. Assuming, of course, that she did not remember the step, un-

der her testimony and that of her companions, the step was not visible by ordinary and reasonable observation because of the congestion of people in the passageway. It is believed that the issue of contributory negligence which was left to the jury and decided favorable to Mrs. Daniels is a factual issue concluded by the verdict of the jury.

### Motion for New Trial.

Failing on its motion for judgment n.o.v., defendant has moved for a new trial. This motion is independent from the motion for judgment notwithstanding the verdict. It is governed by different principles. The motion for a new trial is addressed to the trial judge's discretion and he should grant a new trial if he thinks there has been error, or if he thinks the verdict is incorrect, or if for any reason the trial judge is convinced that justice has not been done. In respect to this motion, it is also the duty of the court to review and weigh the evidence in order to determine whether the verdict was contrary to the weight of the credible evidence. See Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498; Magee v. General Motors Corp., 3 Cir., 213 F.2d 899; and Costack v. Pennsylvania R. Co., 376 Pa. 341, 102 A.2d 127.

In my opinion there was ample credible evidence to support the verdict of the jury. In the Wessner v. Blue Ridge Trans. Co. case, supra, part of the language used is as follows:

"'* * * Common observation is enough to satisfy us that the defendants' rest room did not deviate from the standard customarily regarded as requisite by other reasonably careful persons under like circumstances * * *.'"

In the instant case, from the evidence especially the photographs, it is this court's observation that the step at the parking lot end of the curved pedestrian bridge is simply an engineering monstrosity. It is, of course, true that on entering the ramp from the parking lot there is no excuse for not observing the step. In the movement of persons toward the step from the parking lot they converge on the entrance piecemeal, so to speak, and by choice. On leaving the west end of the building, however, the situation is to the contrary. Pedestrians must leave by the one method and walk one step down to the ramp. On a crowded day such as the day being discussed here, the individuals in the crowd have no reasonable choice but to move forward with the others. A person walking in the congested mass of people moves in a closed corridor down a gradual descent, the descent being approximately 12 feet as the rate is .338 inches per foot for approximately 40 feet. A person walking along under those circumstances is lulled into a sense of security or freedom from watchfulness as there is no indication or sign that a step is located at the end of the ramp. Under the circumstances it is believed that the verdict of the jury was correct.

A new trial will be denied.