202 P.3d 924 (2009)
WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT, a special purpose district of the state of Washington, and The Baseball Club of Seattle, LP, a Washington limited partnership, Appellants,
v.
HUBER, HUNT & NICHOLS-KIEWIT CONSTRUCTION COMPANY, a Washington joint venture; Hunt Construction Group, Inc., a foreign corporation; and Kiewit Construction Company, a foreign corporation, Respondents/Cross Appellants.
No. 81029-0.
Supreme Court of Washington, En Banc.
Argued March 13, 2008.
Decided March 5, 2009.
*925 Stephen Michael Rummage, Zachary Tomlinson, John Hitchcock Parnass, Davis Wright Tremaine LLP, Seattle, WA, for Appellants.
David Clark Groff Jr., Michael Porter Grace, Groff Murphy PLLC, Richard Miles Stanislaw, Christopher Wright, Stanislaw Ashbaugh LLP, Theodore Alexander Sheffield, Lane Powell PC, Richard Lawrence Martens, Steven A. Stolle, Martens & Associates PS, Seattle, WA, for Respondents/Cross-Appellants.
Douglas R. Roach, Ahlers & Cressman PLLC, Seattle, WA, Amicus Curiae on behalf of Associated General Contractors of Washington.
STEPHENS, J.
¶ 1 The Washington State Major League Baseball Stadium Public Facilities District (PFD) and the Baseball Club of Seattle, LP (Mariners) appeal an order granting summary judgment in favor of Huber, Hunt & Nichols-Kiewit Construction (HK) on their construction defect claims. The appellants contend their action is "for the benefit of the state" and thus exempt from the six year contract statute of limitations under RCW 4.16.160. Br. of Appellants at 19. HK filed a conditional cross-appeal against subcontractors Long Painting, Inc., and Herrick Steel, Inc., contending that if the summary judgment order dismissing the claims of the PFD and the Mariners is reversed, reversal of the order dismissing HK's third party claims against Long Painting and Herrick Steel is warranted. Long Painting in response argues that HK's appeal regarding the dismissal of HK's third party claims is frivolous and asks for attorney fees under RAP 18.9. We reverse and remand for further proceedings.

FACTS
¶ 2 The PFD, a Washington municipal corporation, developed and owns Safeco Field, home field of Major League Baseball's Seattle Mariners. The Mariners perform maintenance and repair of Safeco Field. By agreement, the PFD must reimburse the Mariners for "Unanticipated Capital Costs" incurred in making repairs to the facility. Clerk's Papers (CP) at 201.
¶ 3 HK is a joint venture composed of two of the nation's largest construction companies, Hunt Construction Group and Kiewit Construction Company. On May 6, 1996, the PFD executed a contract (Construction Agreement) with HK, defining terms and obligations in connection with the construction of Safeco Field.
¶ 4 Section 07252 of the Construction Agreement required HK to apply an intumescent fire protection coating system to Safeco Field's exposed structural steel beams and columns. The coating system specifications required HK to engage in a three-layer application process: (1) apply a primer to the raw steel at the place of fabrication, (2) spray the intumescent product on the beam or column, and (3) paint the beam or column.
¶ 5 General contractor HK hired subcontractors Long Painting and Herrick Steel to participate in parts of the application process. Herrick Steel was hired for surface preparation, prime painting, and installation of steel components. Long Painting was hired for application of the intumescent coating on the steel structural members. HK achieved substantial completion of the Construction Agreement on July 1, 1999.
¶ 6 In 2005, the Mariners discovered a catastrophic failure in the intumescent coating system. Following an extensive investigation, the Mariners concluded that the system had failed between the primer layer and *926 intumescent coating layer and the failure resulted from HK's use of an improper primer that was incompatible with the overlain intumescent coating product. As a result of HK's error rather than normal wear and tear or exhaustion of useful life, the intumescent product separated from the beam or column.
¶ 7 The coating failure appeared first as visible blisters. The Mariners attempted to repair these blisters, but removal of a blister routinely caused the intumescent product to fall off the entire column or beam. The Mariners advanced more than $2.46 million to pay for the first phase of repairs, which covered approximately 29,600 square feet of structural steel beams and columns. Additional repair costs have accumulated since the first phase of repairs.
¶ 8 On August 14, 2006, the PFD and the Mariners sued HK, seven years after substantial completion of the Construction Agreement by HK. The PFD and the Mariners alleged that HK breached the Construction Agreement by failing to execute the construction at Safeco Field in accordance with the contract specifications and sought to recover all costs and expenses associated with repairs of the defective work.
¶ 9 On October 13, 2006, HK filed its answer, and among many defenses, HK alleged that the claims of the PFD and Mariners were "time barred by the Statute of Limitations." CP at 9, 12. HK also asserted third party claims against subcontractors Long Painting and Herrick Steel. On February 23, 2007, HK brought a motion for summary judgment as to all claims asserted by the PFD and the Mariners contending that the PFD and the Mariners failed to file their complaint within the six year statute of limitations for breach of contract claims.
¶ 10 On March 23, 2007, the trial court entered an order granting HK's motion for summary judgment against the PFD and the Mariners, also dismissing the third party claims by HK against Long Painting and Herrick Steel.
¶ 11 On April 9, 2007, the PFD and the Mariners appealed the summary judgment order to Division One of the Washington State Court of Appeals. On April 19, 2007, HK cross-appealed to the Court of Appeals the dismissal of HK's third party claims in the event that the Court of Appeals reversed the trial court's summary judgment order. In response, Long Painting in its briefing asked for attorney fees against HK for filing a frivolous appeal. Both appeals were transferred pursuant to RAP 4.4 from Division One of the Court of Appeals to this court.

ANALYSIS
¶ 12 First, we address whether summary judgment is appropriate for the claims by the PFD and the Mariners against HK. Second, we examine the third party claims of HK against Long Painting and Herrick Steel.
¶ 13 On review of a summary judgment order, we engage in the same inquiry as the trial court. Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 177, 125 P.3d 119 (2005). All facts and reasonable inferences are considered in a light most favorable to the nonmoving party, while all questions of law are reviewed de novo. Berger v. Sonneland, 144 Wash.2d 91, 102-03, 26 P.3d 257 (2001). Summary judgment is appropriate only when there are no disputed issues of material fact and the prevailing party is entitled to judgment as a matter of law. CR 56(c).

PFD and the Mariners v. HK
¶ 14 HK contends that the claims of the PFD and Mariners accrued no later than July 1, 1999, the date of substantial completion. CP at 174-76. The applicable limitations period for contract claims is six years. RCW 4.16.040. Thus, HK contends that summary judgment was proper because the PFD and Mariners filed their complaint on August 14, 2006, more than seven years after substantial completion. CP at 1-8.
¶ 15 The PFD and Mariners respond that summary judgment was improper because their breach of contract action was brought "`for the benefit of the state'" and is thus exempt from the six year statute of limitations on contract actions. Br. of Appellants at 19. They rely on RCW 4.16.160, which states:

*927 The limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasimunicipality of the state, in the same manner as to actions brought by private parties: PROVIDED, That, except as provided in RCW 4.16.310,[[1]] there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state: AND FURTHER PROVIDED, That no previously existing statute of limitations shall be interposed as a defense to any action brought in the name or for the benefit of the state, although such statute may have run and become fully operative as a defense prior to February 27, 1903, nor shall any cause of action against the state be predicated upon such a statute.
This provision reflects a facet of sovereign immunity under the old English common law doctrine, "nullum tempus occurrit regi," meaning "no time runs against the king." Sigmund D. Schutz, Time to Reconsider Nullum Tempus Occurrit RegiThe Applicability of Statutes of Limitations Against the State of Maine in Civil Actions, 55 Me. L.Rev. 373, 374 (2003).
¶ 16 This court in Washington Public Power Supply System v. General Electric Co., 113 Wash.2d 288, 295, 778 P.2d 1047 (1989) (WPPSS) determined that when a municipality brings an action that arises out of the exercise of powers traceable to the State's sovereign powers delegated to the municipality, the municipality as an agent of the State is bringing the action "for the benefit of the state" within the meaning of RCW 4.16.160. RCW 4.16.160 exempts a municipality from a statute of limitation in this circumstance. WPPSS, 113 Wash.2d at 295, 778 P.2d 1047.
¶ 17 The "for the benefit of the state" language in RCW 4.16.160 is properly understood to refer to the character or nature of municipal conduct rather than its effect. WPPSS, 113 Wash.2d at 293, 778 P.2d 1047. The only inquiry is whether the municipal action arises from an exercise of powers traceable to delegated sovereign state powers or whether such action is proprietary and thus subject to the statute of limitation. Id. at 296, 778 P.2d 1047. Each case is determined in light of the particular facts involved. Id.
¶ 18 In determining whether an action is sovereign or proprietary, we may look to constitutional or statutory provisions indicating the sovereign nature of the power and may also consider traditional notions of powers that are inherent in the sovereign. Id. Relevant to this analysis are the general powers and duties under which the municipality acted, the purpose of those powers, and whether the activity or its purpose is normally associated with private or sovereign acts. Id. The distribution of benefits is irrelevant. Id.
¶ 19 The principal test for determining whether a municipal act involves a sovereign or proprietary function is whether the act is for the common good or whether it is for the specific benefit or profit of the corporate entity. Okeson v. City of Seattle, 150 Wash.2d 540, 550, 78 P.3d 1279 (2003); Hagerman v. City of Seattle, 189 Wash. 694, 701, 66 P.2d 1152 (1937). McQuillin's treatise explains the difference between sovereign and proprietary functions:
The purposes of municipal corporations, using the term in its strict meaning, are twofold: the one to assist in the government of the state as an agent of the state, often referred to as an arm of the state, and to promote the public welfare generally; the other to regulate and to administer the local and internal affairs of the territory which is incorporated, for the special benefit and advantage of the urban community embracing within the corporation boundaries. These two functions are usually referred to as the dual powers of municipal corporations.
1 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 2.09, at 158 (3d ed.1999) (footnote omitted).
¶ 20 In WPPSS, this court held that the state electrical supply system was not acting "for the benefit of the state" within the *928 meaning of RCW 4.16.160 because there was "no indication in the Washington Constitution or in the statutes that the development, production, or sale of electric power to the citizens of Washington is a sovereign duty of the State." WPPSS, 113 Wash.2d at 300-01, 778 P.2d 1047. To the contrary, the production of electricity had not traditionally been considered a sovereign duty, but rather was considered a proprietary municipal function. Id. at 301, 778 P.2d 1047. This court stated:
There is one statutory provision which authorizes cities of the first class, PUD's, and joint operating agencies to participate together in the development of nuclear and other thermal facilities to achieve "economies of scale and thereby promot[e] the economic development of the state and its natural resources to meet the future power needs of the state and all its inhabitants." RCW 54.44.010. The Legislature declared this to be "in the public interest and for a public purpose." RCW 54.44.010. However, enabling this type of participation to achieve economies of scale, while in the public interest, does not transform the production of electric energy into a sovereign duty.
Id. at 300, 778 P.2d 1047 (alteration in original).
¶ 21 We have never before considered whether a municipality's actions in constructing a professional sports stadium involve a sovereign or proprietary function. The PFD and the Mariners contend that CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996), supports their argument insofar as CLEAN recognized that the construction of Safeco Field was a proper exercise of the State's police power, which is necessarily a sovereign power. We do not read CLEAN so expansively. While we there addressed the public purpose involved in the stadium construction, no determination in CLEAN was made as to whether the PFD's construction of Safeco Field was an act in the sovereign capacity "for the benefit of the state" under RCW 4.16.160. CLEAN, 130 Wash.2d at 786, 928 P.2d 1054.
¶ 22 The mere fact that a government project serves a public purpose or grants an economic benefit does not elevate it to the level of a sovereign act. See WPPSS, 113 Wash.2d at 300, 778 P.2d 1047. Public health and safety are not the basis for distinguishing between governmental and proprietary functions of a municipality. See City of Moses Lake v. United States, 430 F.Supp.2d 1164, 1177-78 (E.D.Wash.2006) (holding that the operation of a municipal water system is a proprietary activity and that Moses Lake was not entitled to invoke RCW 4.16.160 to salvage otherwise untimely tort claims); cf. Okeson, 150 Wash.2d at 550-51, 78 P.3d 1279 (holding that a municipality's operation of street lights and traffic signals involves a sovereign function).
¶ 23 We have found an action to be "for the benefit of the state" under RCW 4.16.160 where it involves a duty and power inherent in the notion of sovereignty or embodied in the state constitution. WPPSS, 113 Wash.2d at 296, 778 P.2d 1047. For example, in Bellevue School District No. 405 v. Brazier Construction Co., 103 Wash.2d 111, 115-16, 691 P.2d 178 (1984), we held that a school district could bring tort claims for design and construction defects 20 years after completion because in building schools the district was acting in its sovereign capacity.
¶ 24 Similarly, we have held that actions arising out of the sovereign power of taxation are not subject to the bar of a statute of limitations. Gustaveson v. Dwyer, 83 Wash. 303, 309-10, 145 P. 458 (1915); Commercial Waterway Dist. No. 1 v. King County, 10 Wash.2d 474, 479-80, 117 P.2d 189 (1941); City of Tacoma v. Hyster Co., 93 Wash.2d 815, 821, 613 P.2d 784 (1980); Allis-Chalmers Corp. v. City of North Bonneville, 113 Wash.2d 108, 112, 775 P.2d 953 (1989). This court in Gustaveson stated:
It is apparent from the doctrine of these authorities that a general statute of limitations has no application, whether the tax sought to be collected is to become the property of the state and payable directly into the state treasury, or whether it is to become the property of the particular county or municipality and payable into the municipal treasury to be expended for municipal purposes. In either case the tax has been imposed and collected for the express purpose of carrying on the functions *929 of government.... All of the rights of the county here involved are traceable to and rest in the sovereign power of taxation.
Gustaveson, 83 Wash. at 309-10, 145 P. 458.
¶ 25 In Louisiana-Pacific Corp. v. ASARCO Inc., the Ninth Circuit Court of Appeals applying Washington State law held that the port of Tacoma acted in a sovereign capacity when it leased port log yards because the state constitution provides that areas designated by the port commission up to 2,000 feet from the harbor line "`shall be reserved for landings, wharves, streets, and other conveniences of navigation and commerce.'" 24 F.3d 1565, 1582 (1994) (quoting WASH. CONST. art. XV, § 1). Thus, the port of Tacoma could bring tort claims after expiration of the limitation period, pursuant to RCW 4.16.160. Id.
¶ 26 This court has held in sovereign immunity cases that a municipal corporation's improvements, construction, or maintenance of public parks, swimming pools, or merry-go-rounds for public recreation involve sovereign governmental functions. Russell v. City of Tacoma, 8 Wash. 156, 159, 35 P. 605 (1894); State v. Metro. Park Dist. of Tacoma, 100 Wash. 449, 452, 171 P. 254 (1918); Nelson v. City of Spokane, 104 Wash. 219, 220, 176 P. 149 (1918); Stuver v. City of Auburn, 171 Wash. 76, 82, 17 P.2d 614 (1932); Mola v. Metro. Park Dist. of Tacoma, 181 Wash. 177, 182, 42 P.2d 435 (1935); Kilbourn v. City of Seattle, 43 Wash.2d 373, 380, 385, 261 P.2d 407 (1953); Port of Seattle v. Int'l Longshoremen's & Warehousemen's Union, 52 Wash.2d 317, 322, 324 P.2d 1099 (1958). This accords with the view of other states that the construction and maintenance of facilities for public recreation are sovereign functions. Packard v. Rockford Prof'l Baseball Club, 244 Ill.App.3d 643, 613 N.E.2d 321, 325-27, 184 Ill.Dec. 294 (1993); Libertarian Party v. State, 199 Wis.2d 790, 546 N.W.2d 424, 435-36 (1996); Kelly v. Marylanders for Sports Sanity, Inc., 310 Md. 437, 530 A.2d 245, 259-60 (1987).
¶ 27 In Packard, for example, the Illinois Court of Appeals held that sovereign immunity principles applied to a city park district as a security provider at a professional baseball field because this act was a governmental function. 184 Ill.Dec. 294, 613 N.E.2d at 325-27. The Illinois Court of Appeals based its holding on the fact that the park district had the power to lease, establish, and maintain athletic fields under Illinois State statutes and was obligated under a stadium lease to operate and maintain the field during baseball games. Id. at 327.
¶ 28 In Libertarian Party, the Wisconsin Supreme Court held that the construction of the Milwaukee Brewers' professional baseball stadium did not violate the internal improvements clause of the Wisconsin Constitution because the construction of the baseball stadium for public recreational purposes was similar to a municipality's construction of a natural public park and thus served a predominantly governmental function. Libertarian Party, 546 N.W.2d at 435-36. In upholding sports stadium legislation, a California State court has compared the creation of modern sports stadiums to the great public arenas in ancient Greece. Los Angeles County v. Dodge, 51 Cal.App. 492, 197 P. 403, 407 (1921).
¶ 29 Particularly instructive here is the Maryland Court of Appeals decision in Kelly, cited with approval by this court in CLEAN, 130 Wash.2d at 793, 928 P.2d 1054 (citing Kelly, 530 A.2d at 257). In Kelly, the Maryland State Legislature created the Maryland Stadium Authority (Authority), designated as a public corporation and instrumentality of the State. Kelly, 530 A.2d at 245-46. Much like the PFD here, the Authority was vested with broad power to regulate the use and operation of its facilities and to charge fees. Id. The Authority was authorized to borrow money, issue bonds in connection with the acquisition and construction of facilities, and acquire property as needed. Id.
¶ 30 Various bills were passed and signed into law through the Maryland State Legislature that defined the financial parameters in which the Authority could construct the sports stadiums. Id. at 246-49. Opponents of the Authority filed suit, claiming the legislation was not an appropriation "`for maintaining the State Government'" within the contemplation of the Maryland Constitution *930 to exempt it from referendum. Id. at 249-50 (quoting MD. CONST. art. XVI, § 2).
¶ 31 While recognizing that stadium construction served a public purpose, the Maryland Court of Appeals determined that the real issue was whether Maryland's involvement was an exempt appropriation "`for maintaining the State Government.'" Id. at 257-58 (quoting MD. CONST. art. XVI, § 2). The Maryland Court of Appeals emphasized that the "for maintaining the State Government" clause was a higher standard than a mere public purpose:
In determining whether a particular appropriation is for maintaining the State government within the meaning of the Referendum Amendment, our cases have variously described the appropriation as being for a "primary," "imperative," or "important" function of State government.... As otherwise stated in Bickel, the proper test is whether the governmental activity being funded comes "within the class of those for maintaining the government, without reference to the existing need or lack of it."
Id. at 259 (quoting Bickel v. Nice, 173 Md. 1, 11, 192 A. 777 (1937)).
¶ 32 Ultimately, the court determined that the stadium project met the higher standard. Id. at 259-60. Maryland State courts subsequently held that expansions of a convention center and a public ballot program were sovereign acts because both were legislatively authorized, were for the public interest, and gave little profit to the municipalities at issue. Bell Atl.-Md., Inc. v. Md. Stadium Auth., 113 Md.App. 640, 688 A.2d 545, 551 (1997); Burns v. Mayor & City Council, 71 Md.App. 293, 525 A.2d 255, 262 (1987).
¶ 33 The Safeco Field project similarly reflects the sovereign function of providing for public recreation. The state legislature and the King County Council created the PFD, a municipal corporation. LAWS OF 1995, 3d Spec. Sess., ch. 1, §§ 201(4)(b) at 5, 301(1)-(5), at 8; KING COUNTY ORDINANCE 12000, § 6, at 8 (1995). The PFD consistent with chapter 36.100 RCW was delegated broad state powers to "acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium." LAWS OF 1995, 3d Spec. Sess., ch. 1, §§ 201(1), at 4, (4)(b) at 5; KING COUNTY ORDINANCE 12000, § 4C at 5. This court previously upheld the constitutionality of the delegation of legislative powers to the PFD under the stadium act. King County v. Taxpayers of King County, 133 Wash.2d 584, 605-06, 949 P.2d 1260 (1997).[2]
¶ 34 From its inception, the PFD's construction of Safeco Field involved the traditional sovereign function of providing public recreational benefits, like the public parks in Russell, Metropolitan Park District of Tacoma, Nelson, and Kilbourn, the swimming pools in Mola, and the playgrounds in Stuver. See Russell, 8 Wash. at 159, 35 P. 605; Metro. Park Dist. of Tacoma, 100 Wash. at 452, 171 P. 254; Nelson, 104 Wash. at 220, 176 P. 149; Kilbourn, 43 Wash.2d at 380, 385, 261 P.2d 407; Mola, 181 Wash. at 182, 42 P.2d 435; Stuver, 171 Wash. at 82, 17 P.2d 614. It is not necessary that the Washington State Constitution explicitly mandate the construction of professional baseball stadiums in order for this to be a sovereign function. The constitution does not explicitly require the construction of merry-go-rounds at city playgrounds, public libraries, or art museums, yet this court has determined that the construction and maintenance of such facilities for public recreational purposes involve *931 the exercise of a sovereign governmental power. Stuver, 171 Wash. at 82, 17 P.2d 614; Heavens v. King County Rural Library Dist., 66 Wash.2d 558, 566, 404 P.2d 453 (1965); Int'l Longshoremen's & Warehousemen's Union, 52 Wash.2d at 322-23, 324 P.2d 1099.[3]
¶ 35 As in Maryland's Kelly case, Wisconsin's Libertarian Party case, and Illinois' Packard case, the PFD has been delegated broad powers by the state legislature to create and maintain a sports stadium for public recreation. Laws Of 1995, 3d Spec. Sess., ch. 1, §§ 201(1), at 4, (4)(b) at 5; see also Kelly, 530 A.2d at 246; Libertarian Party, 546 N.W.2d at 428-29; Packard, 184 Ill.Dec. 294, 613 N.E.2d at 325. We have held that the PFD operates Safeco Field for the public benefit, and any excess profit from the venture is put into the excess revenues fund for future capital maintenance costs. CLEAN, 130 Wash.2d at 796-97, 928 P.2d 1054; Laws Of 1995, 3d Spec. Sess., ch. 1, § 203(3)(a) at 7-8. The construction of Safeco Field creates recreational benefits that reflect a sovereign, not proprietary purpose.
¶ 36 We reverse the trial court's order granting summary judgment in favor of HK and remand for further proceedings. Consistent with 90 years of jurisprudence by this court and other state courts, we hold that the construction of Safeco Field by the PFD as an agent of the State was a sovereign act creating public recreational benefits and traceable to delegated sovereign powers. Thus, the action by the PFD and the Mariners against HK regarding construction defects at Safeco Field qualifies under the "for the benefit of the state" exemption to the six year contract statute of limitations in RCW 4.16.160.

HK v. Long Painting & Herrick Steel
¶ 37 HK argues that if we reverse the summary judgment order involving the PFD and Mariners' claims, we should also reverse the summary judgment dismissal of its third party claims against Long Painting and Herrick Steel. See Br. of Respondents/Cross-Appellants at 23-24; Reply Br. of Cross-Appellants at 3-5. We agree that the record before us is insufficient to support summary judgment in favor of the subcontractors. Long Painting and Herrick Steel did not bring summary judgment motions against HK, and the basis for the trial court's order granting summary judgment is not entirely clear but appears to follow solely from the grant of summary judgment to HK.
¶ 38 While RAP 2.5(a) allows us to affirm a trial court order on any basis supported in the record, the record here does not allow us to consider whether HK's third party claims should be treated the same as the PFD and Mariners claims under RCW 4.16.160 or whether any ground in equity requires this result. See Br. of Amicus Curiae Associated General Contractors of Washington at 11-12. Accordingly, we reverse the order granting summary judgment to Long Painting and Herrick Steel and remand to the trial court so that the parties may have their arguments and authorities fully considered. We deny Long Painting's request for attorney fees under RAP 18.9.

CONCLUSION
¶ 39 We reverse the trial court's summary judgment order in favor of HK and remand for further proceedings consistent with this opinion. We hold that the construction of Safeco Field by the PFD involves the exercise *932 of sovereign powers traceable to delegated sovereign powers of the State, and claims based on its construction fall within the "for the benefit of the state" statute of limitations exemption in RCW 4.16.160. We also reverse the trial court's summary dismissal of HK's third party claims against Long Painting and Herrick Steel and remand for the trial court to consider further argument and authorities as to these claims. We deny Long Painting's request for attorney fees.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, MADSEN, OWENS, and FAIRHURST, JJ.
SANDERS, J. (dissenting).
¶ 40 I disagree with the majority's improper expansion of RCW 4.16.160's limited exception to the six-year statute of limitations, which exempts sovereign actions brought "for the benefit of the state."[1] Construction of a professional baseball stadium for private profit is certainly not "for the benefit of the state" as that phrase is understood in our case law. I would thus affirm the order granting summary judgment of dismissal in favor of Huber, Hunt & Nichols-Kiewit Construction (HK) on statute of limitations grounds.
¶ 41 In an unsurprising turn of events, the PFD[2] and the Mariners[3] now ask this court to reverse the summary judgment order dismissing their Safeco Field construction defects lawsuit against general contractor HK as barred by the statute of limitations. The majority holds summary judgment favoring HK should be reversed because the construction of Safeco Field by the PFD can be traced to the delegated sovereign power of promoting "public recreation," thus qualifying for the "for the benefit of the state" exemption to the statute of limitations.
¶ 42 For the reasons which follow, the construction of Safeco Field does not fall within the sovereign power to promote public recreation. In summary this is so because (1) there is no mandatory constitutional or statutory duty to build a professional baseball stadium and voluntary contracts do not fall under nullum tempus occurrit regi (nullum tempus)[4] exemptions such as RCW 4.16.160, and (2) the construction of Safeco Field was a proprietary, not sovereign, act because a substantial admission fee is required to enter.
¶ 43 As correctly observed by the majority, Washington Public Power Supply System v. General Electric Co., 113 Wash.2d 288, 295-96, 778 P.2d 1047 (1989) (WPPSS) holds the test to determine whether a municipal action falls under the "for the benefit of the state" statute of limitation exemption in RCW 4.16.160 is whether the municipality brings an action that arises out of the exercise of powers traceable to the State's sovereign powers delegated to the municipality, rather than proprietary profit. The "for the benefit of the state" language in RCW 4.16.160 is properly understood to refer to the character or nature of municipal conduct rather than its effect. WPPSS, 113 Wash.2d at 293, 778 P.2d 1047.
*933 ¶ 44 I also agree with the majority that to determine whether an action is sovereign or proprietary we may look to constitutional or statutory provisions identifying the sovereign nature of the power and may also consider traditional notions of powers inherent in the sovereign. Id. at 296, 778 P.2d 1047. Relevant to this analysis are the general powers and duties under which the municipality acted, the purpose of those powers, and whether the activity or its purpose is normally associated with private or sovereign acts. Id.
¶ 45 We recently held the test for determining whether a municipal act involves a sovereign or proprietary function is whether the act is for the common public good or whether it is for the specific benefit or profit of the corporate entity within local boundaries. Okeson v. City of Seattle, 150 Wash.2d 540, 550, 78 P.3d 1279 (2003). However I disagree with the majority's application of these principles because the PFD's construction of a $517 million professional baseball stadium to profit the Mariners was not a sovereign act, but a proprietary one.

1. Building a Professional Baseball Stadium through Voluntary Contracts Is Not a Sovereign Power or Duty Mandated under the Constitution or By Statute
¶ 46 The majority claims the PFD's building of Safeco Field was promoting the traditional sovereign function of "public recreation." Majority at 930-31. However the majority also concedes no part of the Washington State Constitution or any legislative enactment mandates building professional baseball stadiums. Majority at 930-31.
¶ 47 Rather, the majority purports to rely on a Maryland Court of Appeals holding in Kelly v. Marylanders for Sports Sanity, Inc., 310 Md. 437, 530 A.2d 245, 257-60 (1987) (quoting MD. CONST. art. XVI, § 2), that construction of professional sports stadiums in Maryland through delegated governmental powers was an appropriation "`for maintaining the State Government.'" In consequence Maryland exempts from referendum public recreational activities such as professional sports as a fundamental governmental purpose. Majority at 929-30. The majority analogizes Safeco Field's construction by the PFD under the stadium act (Laws of 1995, 3d Spec. Sess., ch. 1) to the construction of Maryland professional sports stadiums by the Maryland Stadium Authority, contending both acts promoted the sovereign function of public recreation. The majority claims this case supports its view that the suit by the PFD and Mariners against HK is exempt from the statute of limitations bar. Majority at 930-31. But the majority neglects to mention other cases from the Maryland Court of Appeals also hold nullum tempus laws do not apply to state subdivisions, counties, or municipalities that voluntarily contract with others. Baltimore County v. RTKL Assocs., Inc., 380 Md. 670, 846 A.2d 433, 440-44 (2004).
¶ 48 Likewise, several Pennsylvania courts have also concluded nullum tempus does not apply to municipalities that engage in voluntary written contracts or act under enabling acts. For example the United States Court of Appeals for the Third Circuit, applying Pennsylvania law, held the city of Philadelphia as a political subdivision of the Commonwealth of Pennsylvania could not maintain an action under the nullum tempus doctrine against defendant manufacturers of lead based paint used in residential buildings. This was because the city of Philadelphia was suing the defendants on voluntary contracts neither mandated by constitution nor statute. City of Philadelphia v. Lead Indus. Ass'n, 994 F.2d 112, 119-21 (3d Cir.1993).
¶ 49 Pennsylvania's Northampton County Area Community College v. Dow Chemical, U.S.A., 389 Pa.Super. 11, 566 A.2d 591 (1989), also illustrates nullum tempus applies only to duties imposed by law rather than voluntary enabling acts. There Dow Chemical manufactured masonry panels containing Sarabond, a mortar bonding agent used in the construction of the Engineering and Business Technologies Center in the Northampton County Area Community College (Northampton). Northampton officials later discovered likely Sarabond-related masonry cracks in the Center. Id. at 593-94. Northampton sued Dow in tort; however the Court of Common Pleas, Civil Division, dismissed *934 Northampton's case on the statute of limitations grounds. Id. at 594. It held Northampton as a community college did not qualify under nullum tempus because contracting for the Center was a proprietary act when it acted in its proprietary capacity. Id. Therefore Northampton was not an agency of the Pennsylvania State Commonwealth (Commonwealth). Id.
¶ 50 The Pennsylvania Superior Court on appeal affirmed on different grounds. Id. at 595-96. The superior court recognized there was a state constitutional right to public education in the Commonwealth. Id. at 597. However, it noted the state legislature of the Commonwealth created community colleges like Northampton through an enabling act rather than a mandated statute as was the case with state colleges. Id. at 596-98. After analysis of relevant commonwealth statutes, the court determined the Commonwealth did not control the community colleges' creation and operation, rather local sponsors created the community colleges. Id. Thus, because community colleges were established through enabling rather than mandatory acts, the superior court held Northampton did not qualify under the nullum tempus doctrine to an exemption from the statute of limitations because it was not a subdivision of the Commonwealth. Id.
¶ 51 Similarly, a Virginia court held that when the Richmond Metropolitan Authority constructed a baseball stadium as an auxiliary arm of local government funded by local revenue bonds, it was acting in a proprietary capacity and thus did not qualify under the Virginia state codified nullum tempus exemption. Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 42 Va. Cir. 243, 243-46 (1997); Va.Code § 8.01-231.[5]
¶ 52 Likewise, our stadium act was an enabling act that authorized, but did not mandate, the creation of the PFD in "a county with a population of one million or more" and empowered, but did not require, it to "acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium." LAWS OF 1995, 3d Spec. Sess., ch. 1, §§ 201(1), (4)(b). King County, not the State, then created the PFD pursuant to the enabling stadium act and empowered it to build and operate a baseball stadium, just as did the community college enabling act in Northampton County Area Community College, 566 A.2d at 596-98; King County Ordinance 12000, § 4C at 5, 6, 8 (1995). The PFD as a municipal corporation then executed a voluntary construction contract with HK to construct Safeco Field, just as the municipalities voluntarily contracted in RTKL Associates, 846 A.2d at 440-44 and City of Philadelphia, 994 F.2d at 119-121; Clerk's Papers (CP) at 45-102. The PFD built a baseball stadium as an auxiliary arm of local government with local revenues as was the case in Richmond Metropolitan Authority, 42 Va. Cir. at 243-46. Moreover Washington State has a codified nullum tempus statute just like Virginia's. RCW 4.16.160; Va.Code § 8.01-231. Thus, because the PFD constructed Safeco Field under voluntary contracts, and acted pursuant to enabling acts, it acted in a proprietary capacity that simply cannot qualify under the "for the benefit of the state" exemption as a matter of law.

2. The Substantial Admissions Fee Charged to Enter Safeco Field Serves the Proprietary Interest of the Mariners, Not the Public
¶ 53 In a last gasp for credibility, the PFD and Mariners attempt to distinguish Pennsylvania law by claiming the nullum tempus doctrine there depends on whether an action was "imposed by law" or "voluntary." Reply Br. of Appellants at 13. The PFD and Mariners contend instead that in Washington the WPPSS analysis under RCW 4.16.160 turns on a qualitative assessment of the nature of the delegated power, not on whether the ultimate municipal action was mandatory. Id.
¶ 54 The PFD and Mariners then contend several Washington State sovereign immunity cases, including Russell v. City of Tacoma, *935 8 Wash. 156, 159, 35 P. 605 (1894) and Kilbourn v. City of Seattle, 43 Wash.2d 373, 380, 385, 261 P.2d 407 (1953), hold a municipal corporation's improvements, construction, or maintenance of public parks for public recreation involve traditional sovereign governmental functions even though not mandated by the state constitution or statute. Majority at 929. The majority argues Safeco Field's construction by the PFD is similar to the construction of a public park as a sovereign function under the "for the benefit of the state" exemption in RCW 4.16.160. Majority at 930-31.
¶ 55 However, the use of the municipal parks in Russell and Kilbourn was free and truly open to the public. Russell, 8 Wash. at 159, 35 P. 605; Kilbourn, 43 Wash.2d at 380, 261 P.2d 407. But Safeco Field is unavailable to the general public. A substantial admissions fee for the Mariners' private profit is required for entry to games.[6] Profit for the Mariners is the raison d'etre for the whole enterprise. This private for profit corporation is exactly that.
¶ 56 Parks charging admission fees with refreshment stands are proprietary, as illustrated by Hoffman v. Scranton School District, 67 Pa. D. & C. 301, 301-02 (1949). There the Scranton School District owned and operated a public park containing an enclosed sports field with spectator seating hosting a football game between two local high schools. An admission fee was charged to attend the game. Id. at 302. Ten thousand spectators paid that fee. Moreover refreshments were sold by concessionaires that paid a portion of that income to the school district. Id. at 302-03.
¶ 57 The school district was sued by a spectator after the spectator fell and injured himself when a shed roof which appeared to be seating collapsed. Id. at 302. The school district claimed governmental immunity and moved for dismissal. Id. at 303. Although the Pennsylvania state court recognized conduct of physical education including high school games was within the legitimate scope of school district educational activity under a traditional sovereign powers notion, and by statute to be a governmental function (id. at 307-08), the court nevertheless held this football game was proprietary because the promotion of the football game, admissions fees collected from 10,000 spectators, and the selling of concessions was a for-profit business. It therefore denied the school district's claim to governmental immunity. Id. at 308-09.
¶ 58 Other state courts in North Carolina, Michigan, Arizona, and Massachusetts similarly hold when a substantial admissions fee is charged by a municipality to enter a place intended for public recreation, the municipality is acting in a proprietary capacity. Aaser v. City of Charlotte, 265 N.C. 494, 144 S.E.2d 610, 613-14 (1965); Pierson v. Cumberland County Civil Ctr. Comm'n, 141 N.C.App. 628, 540 S.E.2d 810, 811-14 (2000); Glenn v. City of Raleigh, 246 N.C. 469, 98 S.E.2d 913, 919 (1957); Dohm v. Acme Twp., 354 Mich. 447, 93 N.W.2d 323, 326-28 (1958); Rohrabaugh v. Huron-Clinton Metro. Auth. Corp., 75 Mich.App. 677, 256 N.W.2d 240, 243-44 (1977); Sawaya v. Tucson High Sch. Dist. No. 1, 78 Ariz. 389, 281 P.2d 105, 108 (1955); Little v. City of Holyoke, 177 Mass. 114, 58 N.E. 170, 170-71 (1900).
¶ 59 Ohio statutes differentiate between operations of public parks, swimming pools, zoos, and libraries as governmental functions and operations of stadiums, centers, or halls as proprietary functions. Ohio Rev.Code *936 § 2744.01(C)(2)(d), (u)(i)-(iv), (G)(2)(e). For example in Daniels v. County of Allegheny, 145 F.Supp. 358, 361-62 (W.D.Pa.1956), the United States District Court applying Pennsylvania law held a county's operation of an airport was a proprietary function because it contained a hotel, theater, night club, refreshment stands, restaurants, amusement center, drug store, gift shops, and also an observation deck from which it realized admission fees of around $50,000.
¶ 60 We have also held operation of concessions by a municipality at a public park is proprietary. Metro. Park Dist. v. Griffith, 106 Wash.2d 425, 435, 723 P.2d 1093 (1986). Moreover a municipality that allows advertising on municipal property for profit also acts in its proprietary capacity. Hillside Cmty. Church, Inc. v. City of Tacoma, 76 Wash.2d 63, 66, 455 P.2d 350 (1969).
¶ 61 Here, Safeco Field requires a substantial admissions fee for a fan to enter. Compare Okeson, 150 Wash.2d at 550-51, 78 P.3d 1279. See also supra note 6 ("[T]he stadium lease negotiated with the PFD gives the Mariners `the right to receive all Ballpark Derived Revenues.' CP at 319. `Ballpark Derived Revenues' is defined in the lease's definitions section as including `revenues derived from future operation of the Leased Premises and any events or activities scheduled therein ... including, but not limited to: ticket proceeds [and] food and beverage sales....' CP at 308."). The $40 million paid for the stadium naming rights to Safeco Field is retained by the Mariners as are other revenues derived from corporate advertising. CP at 362-63. Safeco Field houses businesses such as restaurants and gift shops like those in the Daniels airport. Daniels, 145 F.Supp. at 361-62; CP at 84-86.
¶ 62 In Russell and Kilbourn, although this court held the construction and maintenance of public parks are sovereign functions, we also recognized that where substantial profits are made that are not incidental to the maintenance of such a park through admission fees or other methods, the function is proprietary.[7]Russell, 8 Wash. at 156-61, 35 P. 605; Kilbourn, 43 Wash.2d at 380, 261 P.2d 407. Although King County and the PFD do not directly profit from Safeco Field, the excess revenues fund used to maintain Safeco Field at issue here is funded by the "first admissions" tax on admission tickets charging substantial fees to enter Safeco Field. LAWS OF 1995, 3d Spec. Sess., ch. 1, § 203(3)(a), at 7-8. The construction of Safeco Field, like the football field park in Hoffman, has all the admissions fee, advertising, and concession hallmarks of a proprietary function that was supported by King County and the PFD through King County Ordinance 12000 and the stadium act. Hoffman, 67 Pa. D. & C. at 301-02.
¶ 63 The PFD and Mariners next contend the construction of a professional baseball stadium is necessary to maintain state government. Majority at 929-31. However, it is simply an indefensible argument that building a professional sports stadium is necessary to maintain our state government. Public economic benefits are not the basis for distinguishing between governmental and proprietary functions of a municipality under RCW 4.16.160. See WPPSS, 113 Wash.2d at 300, 778 P.2d 1047; City of Moses Lake v. United States, 430 F.Supp.2d 1164, 1177-78 (E.D.Wash.2006).
¶ 64 As recognized by the majority, the CLEAN court majority admitted "it cannot be seriously contended that the development of a baseball stadium for a major league team is a `fundamental purpose' of state government." CLEAN v. State, 130 Wash.2d 782, 798, 928 P.2d 1054 (1996). However our majority claims building a professional baseball stadium serves a "public purpose" and therefore asserts "the stadium project is an act in a `sovereign capacity.'" Majority at 931 n. 3. I strongly disagree that public purpose can be attributed to such a private, for-profit corporate entity as the PFD and the Mariners.
¶ 65 The majority judicially manufactures a sovereign function in the PFD's creation of a professional baseball stadium that is nothing other than a proprietary function for the *937 corporate profit of the PFD and the Mariners.
¶ 66 If the PFD's construction and operation of Safeco Field is proprietary, the PFD and Mariners are not entitled to the "for the benefit of the state" exemption to the statute of limitations because this is not an exercise of the sovereign power to promote public recreation. I would affirm (1) the order granting summary judgment in favor of HK against the PFD and Mariners and (2) the sua sponte dismissal of the HK cross-claim against Long Painting and Herrick Steel. I would deny Long Painting's request for attorney fees under RAP 18.9.
¶ 67 Therefore, I dissent.
WE CONCUR: CHAMBERS, and J. JOHNSON, JJ.
NOTES
[1] No party asserts that this provision is applicable.
[2] The PFD was also given the authority by the legislature and through it King County to use tax revenues for the construction of Safeco Field. Laws Of 1995, 3d Spec. Sess., ch. 1, §§ 101(1), at 1, 102(2), at 2, 104, at 3. The Mariners have the future right of reimbursement from the excess revenues fund for the repairs of the intumescent coating defects as an "Unanticipated Capital Cost." CP at 201. The excess revenues fund is to be funded by the "first admissions" tax that was authorized by the legislature in the Stadium Act. Laws Of 1995, 3d Spec. Sess., ch. 1, § 203(3)(a) at 8. While the dedication of tax dollars in this manner confirms the sovereign function at issue, our holding does not rest on the sovereign power of taxation under the Gustaveson line of cases, which concern the collection of taxes. Gustaveson, 83 Wash. at 309-10, 145 P. 458. We have never held that the mere spending of tax revenues constitutes an exercise of delegated sovereign power qualifying under the "for the benefit of the state" exemption to the statute of limitations. RCW 4.16.160.
[3] The CLEAN court stated, "it cannot be seriously contended that the development of a baseball stadium for a major league team is a `fundamental purpose' of state government." CLEAN, 130 Wash.2d at 798, 928 P.2d 1054. This statement was not directed at questioning whether the stadium project constituted a sovereign act. To the contrary, the CLEAN court recognized that most other state courts view similar governmental undertakings as serving a "public purpose." Id. at 793-94, 928 P.2d 1054 (citing Martin v. City of Philadelphia, 420 Pa. 14, 215 A.2d 894, 896 (1966); Kelly, 530 A.2d at 257; Rice v. Ashcroft, 831 S.W.2d 206, 210 (Mo.Ct.App. 1991); Libertarian Party, 546 N.W.2d at 434; Lifteau v. Metro. Sports Facilities Comm'n, 270 N.W.2d 749, 753 n. 5 (Minn. 1978)). As explained above, while "public purpose" does not equate with "sovereign capacity," the fact that cases such as Kelly are cited in CLEAN lends support to the conclusion that the stadium project is an act in a "sovereign capacity." Indeed, the CLEAN court alluded to the interest of public recreation in noting that citizens have an interest in viewing major league baseball in Washington State. CLEAN, 130 Wash.2d at 805-06, 928 P.2d 1054.
[1] RCW 4.16.160:

Application of limitations to actions by state, counties, municipalities.
The limitations prescribed in this chapter shall apply to actions brought in the name or for the benefit of any county or other municipality or quasimunicipality of the state, in the same manner as to actions brought by private parties: PROVIDED, That, except as provided in RCW 4.16.310, there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state: AND FURTHER PROVIDED, That no previously existing statute of limitations shall be interposed as a defense to any action brought in the name or for the benefit of the state, although such statute may have run and become fully operative as a defense prior to February 27, 1903, nor shall any cause of action against the state be predicated upon such a statute.
[2] Washington State Major League Baseball Stadium Public Facilities District (PFD).
[3] The Baseball Club of Seattle, LP (Mariners).
[4] As explained by the majority, nullum tempus occurrit regi (nullum tempus) means "no time runs against the king." Sigmund D. Schutz, Time to Reconsider Nullum Tempus Occurrit RegiThe Applicability of Statutes of Limitations Against the State of Maine in Civil Actions, 55 ME. L.REV. 373, 374 (2003). In other words, statutes of limitation do not apply to the State under common law or statutes such as RCW 4.16.160.
[5] Va.Code § 8.01-231:

Commonwealth not within statute of limitations. No statute of limitations which shall not in express terms apply to the Commonwealth shall be deemed a bar to any proceeding by or on behalf of the same.
[6] Not to mention parking fees that go to the Mariners as well as the revenue from food and drink concessions operated as an extensive monopoly. CP at 323, 325. In fact, the stadium lease negotiated with the PFD gives the Mariners "the right to receive all Ballpark Derived Revenues." CP at 319. "Ballpark Derived Revenues" is defined in the lease's definitions section as including "revenues derived from future operation of the Leased Premises and any events or activities scheduled therein" (but not tax revenues received by the PFD like the "first admissions" tax), "including, but not limited to: ticket proceeds; food and beverage sales; souvenir, apparel and merchandise sales; sale or licensing of naming rights; trademark rights or copyrights pertaining to the Ballpark; marquee rights; sale of advertising; suite and club seat rental and/or licenses; proceeds from the Parking Facility" (constructed at public expense); "restaurant or retail proceeds and/or rental; revenue from broadcasting or other reproductions of events; and revenues derived from subcontracting or subleasing [Safeco Field] for other events or uses." CP at 308.
[7] Similarly, Ohio state statutes define public parks as governmental functions and stadiums as proprietary. Ohio Rev.Code § 2744.01(C)(2)(d), (u)(i)-(iv), (G)(2)(e).